HO vs. WINCHESTER BOAT CLUB, MISC 16-000688

































 
 KATHLEEN K. HO and TIMOTHY S. O'DONNELL, Plaintiffs, v. WINCHESTER BOAT CLUB, Defendant
 MISC 16-000688 
 APRIL 29, 2021
MIDDLESEX, ss.
FOSTER, J.
DECISION














 Introduction 





 Kathleen K. Ho and Timothy S. O'Donnell (the Ho/O'Donnells) own a house on Everett Avenue in Winchester. The side and rear of their property abut open land owned by the Winchester Boat Club (WBC or the boat club) that runs to Mystic Lake. The Ho/O'Donnells and WBC have become embroiled in a dispute over the Ho/O'Donnells' alleged trespass on this open land and an easement for the benefit of the Ho/O'Donnells to cross this land and maintain a dock on the lake, as well as a dispute over zoning relief that WBC sought from the Winchester Zoning Board of Appeals that is the subject of several companion cases decided today. These disputes were tried to me. After hearing the evidence, I find that the Ho/O'Donnells have title by adverse possession to the portion of the stone wall at the rear of their property that encroaches on the boat club's property, that their stone steps at the rear trespass upon the boat club's property but that the Ho/O'Donnells have otherwise not trespassed, and that the Ho/O'Donnells own the dock and have an easement by prescription to maintain this dock even though it is wider than the dock allowed in their easement, but must relocate the dock to within the twelve-foot right of way granted in the easement. 





Procedural History 





 The plaintiffs filed a complaint on November 14, 2016. On the same date, a temporary restraining order issued pending a hearing on the plaintiffs' motion for preliminary injunction. Defendant WBC filed its answer and counterclaim on December 5, 2016. On December 8, 2016, the plaintiffs withdrew their motion for injunctive relief, with prejudice. The plaintiffs filed an answer to the defendant's counterclaim on January 9, 2017. The plaintiffs were granted leave to amend their complaint on February 10, 2017, and plaintiffs filed an Amended Verified Complaint (Complaint) on February 21, 2017. On the same date, the defendant filed its Answer to the Amended Verified Complaint (Answer), containing its counterclaim (Counterclaim). The plaintiffs filed a motion to Enjoin Interference with Easement Rights on July 6, 2017. A hearing on the motion was held on July 20, 2017, and, after the matter was taken under advisement, an Order for Preliminary Injunction issued on July 25, 2017. The defendant filed a Motion to Dismiss or to Compel Discovery on October 5, 2017. On November 7, 2017, the motion was allowed subject to conditions. The pre-trial conference was held on October 18, 2018. On December 12, 2018, the defendant made a motion to enjoin further trespasses on its property by the plaintiffs. The plaintiffs moved to dismiss the defendant's counterclaims for lack of jurisdiction on December 20, 2018. At a hearing held on January 30, 2019, the court allowed in part defendant's Motion to Enjoin Further Trespasses on its Property, and took the plaintiffs' Motion to Dismiss under advisement. The plaintiffs' Motion to Dismiss was allowed in part, and defendant's two nuisance claims, as well as the defendant's counterclaim regarding removal of sticks and leaves, were dismissed without prejudice on March 13, 2019. 





 A view was taken on June 24, 2019. A trial was held on June 24, 25, 26, 27, and July 25, 2019. Testimony was heard from Philip McIntyre, Nancy McIntyre, Jack Cleary, Glen Odone, Kathleen Ho, Lawrence Beals, Carl Boerner, James Bowers, and Michael Pustizzi. Exhibits 1- 14A, 14C-137, 138 de bene, 139-158, 76B-F, and 129B were marked, and Exhibits A-G were marked for identification. On the first day of trial, parties stipulated that, with respect to Count I (Complaint, ¶¶ 51-58) allegations and requested relief that related to the companion cases 17 MISC 00204, 17 MISC 000272, 17 MISC 000366 and 18 MISC 000517 (zoning appeal) were struck, and allegations in support of the motion for preliminary injunction would not be considered at trial. Tr. I, 42:23 -46:19. On the third day of trial, plaintiffs' motion for required finding on their adverse possession claim and defendant's motion for required finding on the adverse possession and dock rights claim were denied. Tr. III, 206: 2-18, 207: 5-8. On the fifth day of trial, defendant's motion for mandatory dismissal and plaintiffs' motion for mandatory dismissal of counterclaims were both denied. Zoning Appeal Tr. III, 83: 13-20. Defendant filed its Post-Trial Brief on October 24, 2019. The plaintiffs filed their Post-Trial brief on October 25, 2019. Defendant filed its reply brief on October 31, 2019, and the plaintiffs filed their reply brief on November 1, 2019. Closing arguments were held on November 13, 2019, after which the matter was taken under advisement. This Decision follows. 





Facts 





 Based on the view, [Note 1] the undisputed facts, the exhibits, the testimony at trial, and my assessment of credibility, I make the following findings of fact. 





Parties 





 1. The Ho/O'Donnells own and reside at the house and property located at 48 Everett Avenue, Winchester, Massachusetts (the Property). 





 2. WBC owns and operates a non-profit boat club in Winchester, Massachusetts. Exh. 22. 





Properties 





 1. Philip and Nancy McIntyre (the McIntyres) purchased the Property on August 1, 1990. Tr. I, 48:22-24. 





 2. By quitclaim deed executed on June 5, 1992, John and Susan Caruso conveyed to the Winchester Boat Club a parcel of land shown as Lot 2 on a plan entitled "Plan of Land in Winchester, Mass." Dated May 10, 1989, and recorded with the Middlesex South Registry (registry) as Plan No.44 of 1990 in Book 20323, Page 221 (the Open Space Parcel). The deed was recorded with the registry in Book 22100, Page 235. Exh. 15. 





 3. The McIntyres conveyed the Property to the Ho/O'Donnells, as tenants by the entirety, by quitclaim deed executed on May 30, 2014. The deed was recorded with the registry in Book 63682, Page 437. The conveyance included a grant of certain easement rights held by the McIntyres. Exh. 17. 





Adverse Possession 





 1. Early in the McIntyres' ownership of the Property, Mr. McIntyre had a dry-stacked stone wall built along the rear boundary line separating his property from the boat club's Open Space Parcel. The wall was erected at some point before May of 1994, when the boat club arranged to have yews planted on their side of the wall along the Property's property boundary. Tr. I, 111:4-112:4, 115:14-116:16. 





 2. At the south-western corner of the Property, the stone wall made an angled northwest turn and continued parallel to the boundary line for another 23.77 feet. Exhs. 4C, 54, 59, 97, 112A, 113. 





 3. During the period that the McIntyres owned the Property, Mr. McIntyre would occasionally make small repairs to the stone wall, and during this period the wall remained in the same location as it was when originally constructed. Tr. I, 114:4-13. 





 4. Mr. McIntyre testified that no one from WBC ever informed him that the angled section of stone wall encroached on the boat club's abutting property, nor did anyone from WBC object to the stone wall's presence along the shared boundary line. Tr. I, 114:7-16. 





 5. After the Ho/O'Donnells purchased the Property, they hired stonemason Jack Cleary to rebuild and straighten out the dry-stacked stone wall in the rear of their property. This was done as part of a larger project to regrade the back yard and insert a new patio. Mr. Cleary began his masonry work on the stone wall in summer of 2015. Tr. II, 89:1-24, 181:25-182:13, 184:18-21. 





 6. Mr. Cleary testified that to complete this work, he removed the existing stones to expose the footing underneath the wall, then replaced them with stones and mortar atop the same footing. He used guide pins to ensure the width of the wall remained two feet along its length, the same width as the old wall. Tr. II, 89:6-18, 91:13-92:23. 





 7. Mr. Cleary also testified that he knew where to place the angled portion of the new wall because he simply put it in precisely the same location as the old dry-stacked wall. Tr. II, 92:20-93:8. 





 8. The angled portion of the stone wall was rebuilt in nearly the exact location as the previous wall had existed. Mr. Cleary used the footing under the wall, as well as a stone bound visible in the area, as guides for where to erect this portion of the wall so that it would be within the Property's property line. The stone wall as placed by Mr. Cleary is shown on the plan attached hereto as Exhibit A. Tr. II, 94:5-96:2, 117:21-118:3. Exh. 129B. View. 





 9. The southeastern portion of the wall, which had previously slanted inwards along the Property's boundary line, was moved when rebuilt so that it was closer to the actual property line, without crossing it. The newly-constructed angled portion of the wall, though built in the same location as the original, was not in fact within the Property's property line. It encroached onto the boat club's property, just as had the earlier stone wall at this angled portion. Tr. II, 115:21-116:11. Exh. 129B. 





 10. At the angled portion of the stone wall, as it is currently, it continues to encroach onto the boat club's property. This part of the wall is presently about three or four feet shorter in length than was the original wall in the same location. Tr. II, 127:17-128:7. Exhs. 129A, 138. 





 11. No evidence was produced at trial to suggest that WBC and Mr. McIntyre (or, later, Mr. Cleary) had any conversations about the possible encroachment of this portion of the rear stone wall, either in its original or replaced form. 





 12. Ms. Ho first became aware of the encroachment after a long-term planning committee meeting held by WBC in February of 2016. After the meeting, Mr. Bowers (of WBC) informed Ms. Ho that the angled portion of the stone wall might be "over the property line." Tr. II, 186:7-21; Tr. IV, 26:1-18. 





 13. Ms. Ho was fully informed of WBC's position on the stone wall encroachment in a letter they sent to the Ho/O'Donnells in May of 2016 (May 2016 Letter). The May 2016 Letter discussed the stone wall encroachment, and additionally addressed matters that the boat club wanted rectified by the Ho/O'Donnells, including appropriate use of the deeded easement area (discussed below); improper storm drain run off onto boat club property; and the trespassory removal of landscaping from the northeastern corner of the club's Open Space Parcel along Everett Avenue. Tr. II, 186:22-24. Exh. 53. 





 14. After being informed of the potential encroachment, Ms. Ho hired a surveyor to investigate the area. The surveyor confirmed the that the angled portion of the stone wall did in fact encroach on boat club property. Therefore, Ms. Ho was aware of the encroachment by May of 2016, at the latest. Ms. Ho obtained an estimate to have a landscaper remove the wall, but the landscaper was not ultimately hired and the removal did not take place. Tr. II, 187:3-10. 187:18-188:3; Tr. III 26:25-27:5. Exh. 45. 





 15. Ms. Ho did not proceed to have the encroaching angled portion of the stone wall removed because a temporary restraining order had issued preventing any action taken in the easement area and the area of the stone wall at the rear of the Property. Tr. III, 28:20- 29:15. Exh. 21 at 3(g). 





 16. Surveyor Glen Odone determined the total square footage of the encroachment that included the footprint of the angled portion of the stone wall encroachment and any of WBC's land the wall enclosed. Along this angled section of stone wall, the total encroachment comprises 54 square feet of WBC's property, including the land directly beneath the wall. Tr. II, 127:17-128:13. Exh. 129A. 





 17. Along the southernmost, straight portion of the stone wall, there is an opening with a few stone steps leading onto the lawn of the Open Space Parcel. The older stone wall, which was in place when the McIntyres owned the property, also had an opening in a nearby, though not identical, position. The last step in the current stone wall opening, which was recently set, encroaches onto WBC property. Tr. III, 179:18-180:3. Exhs. 129, 138 at 11. View. 





Easement Rights 





 18. The McIntyres became members of WBC in 1991, around the time they purchased the Property. Tr. I, 119:6-11. 





 19. In April of 1994, the McIntyres had their property subdivided such that a sliver of their property on the western boundary of their lot would be separated from the remainder of the Property. Tr. I, 51:20-54:2. Exh. 3. 





 20. At some point prior to the subdivision, WBC and the McIntyres engaged in discussions that ultimately led to an agreement between them whereby the McIntyres would deed WBC title to the sliver of property off of the western boundary of their lot in exchange for certain easement rights, namely, a twelve-foot wide right of way easement from the rear of the Property across the Open Space Parcel along its eastern bound to Mystic Lake. Exhs. 1, 3. 





 21. After these discussions, but before the parties entered into a formal agreement, the McIntyres began accessing the agreed upon right of way across the Open Space Parcel, to get to the shore of Mystic Lake. Tr. I, 65:23-24. 





 22. Around this time, WBC decided to dispose of certain floating dock pieces that they had previously used on boat club property. A member of WBC's leadership proposed to place a six-foot wide piece of this dock on the southeastern corner of the Open Space Parcel, and Mr. McIntyre agreed with that plan. Tr. I, 70:6-16, 73:10-16, 165:13-15.





 23. At some time in 1991 or 1992, and before WBC and the McIntyres entered into a formal agreement, Carl Boerner and WBC staff maneuvered the dock through the water from its former location to the southeastern corner of the Open Space Parcel, south of the Property's southernmost boundary line. Mr. McIntyre testified that he himself affixed the dock to the shore using metal posts and chains that he hammered into the ground on the shore; Mr. Boerner testified that he did not recall Mr. McIntyre helping install the dock. I credit Mr. McIntyre, and find that he helped to affix the dock personally. Tr. I, 73:17- 74:7, 75:5-13, 76:3-7, 124:1-5; Tr. III, 135:7-20, 137:2-11, 145:22-24. 





 24. Mr. Boerner testified that WBC placed the dock in its present location, at the southeast corner of the Open Space Parcel, because that was the only area on the parcel where the lake was accessible from the shore. He further stated that one purpose of the dock was to enable WBC members to canoe and kayak from the club. Tr. III, 136:13-18, 148:15-20. 





 25. The dock has remained in approximately the same location since it was originally placed on the southern boundary of the Open Space Parcel in 1991 or 1992. At the time it was placed, both Mr. McIntyre and Mr. Boerner believed that the dock was attached to the southern boundary of the agreed-upon right of way. Indeed, even a plan of the Open Space Parcel prepared on August 26, 1999 by Mr. Beals' company, Beals Associates, Inc., showed the dock as falling within the agreed-upon right of way. In a letter to an abutter, Mrs. Carroll, dated April 7, 2008, Mr. Beals again represented that the dock was located at the end of the right of way. Tr. I, 73:20-74:7, 167:3-18; Tr. III, 68: 1-6, 87: 12- 88:1, 140:24-141:7; 195:20-196:3, Exh. 134, Exh. 52, Exh. 39. 





 26. The dock is approximately five or six feet wide. Tr. I, 165:13-15, Tr. III, 140:11-12.





 27. Mr. Boerner also testified that he never represented to the McIntyres that he was gifting the dock to them, nor that he had the authority to do so. Tr. III, 139:290, 140:8. 





 28. The dock was offered to Mr. McIntyre when WBC was updating their "main float area," and no longer had a need for the dock. According to Mr. McIntyre, moving the "surplus" dock to the Open Space Parcel served the needs of both parties: it provided him a dock that he could affix to his easement, "as was always contemplated," and saved WBC the effort of removing and disposing of the dock off-site. Although Mr. McIntyre testified that he did not own the dock, I do not credit that statement. After the dock was affixed, no one from WBC ever maintained it. Mr. McIntyre, on the other hand, would retrieve the dock when it blew away, and would store his kayak and canoe on his dock without comment from WBC. WBC never made any attempt to enforce its policies as to the use of the dock. Under the circumstances, I find that the dock was surrendered by WBC - which no longer had a need for it - and gifted to the McIntyres for use in their easement. Tr. I, 66:19-67:2, 70:1-21, 74:8-22, 82:18-83:5, 94:23-95:21, 124:24-25, Exh. 89. 





 29. On or around the day that the dock was placed on the southeastern corner of the Open Space Parcel, WBC also floated a surplus dock piece to the property of Mr. Caulfield, located in another area of the lake. Tr. III, 146:12-147:22. 





 30. At the time the dock was positioned on the shoreline to the south of the McIntyres' property, there was a black chain link fence (hereinafter referred to as the "chain link fence") separating WBC's Open Space Parcel from the property immediately to the east (belonging at the time to the Carrolls). Mr. McIntyre believed this fence to be on the shared property line between the Open Space Parcel and the Carrolls' property. The position of this fence informed Mr. McIntyre's understanding that his twelve-foot wide easement extended twelve feet from the fence towards the west. Mr. McIntyre further believed, based on the position of the fence, that the dock was installed along the southern boundary of his deeded right-of-way to the shore, and thus within his deeded easement area. I find that, despite the mutual mistake, the dock on the southern boundary of the Open Space Parcel is the dock permitted under the 1996 dock easement (as described below). Tr. I, 166:18-167:8, 167:13- 17, 173:9-22. Exh. 4A. 





 31. As it turns out, the dock is not, and may never have been, within the agreed-upon right of way, due to the mistaken belief by Mr. McIntyre and WBC about the location of the Open Space Parcel's eastern boundary line with the Carrolls. In fact, since it was placed and up until the time of trial, the dock has been located just a few feet outside of the right of way. Tr. I, 74:20-74:7, 167:3-18, Tr. II, 171:5-8, 171:19-25, 172:15-21, Tr. III, 140:24-141:7, 195:20-196:3, Exh. 4 at sheet 2, Exh. 39, Exh. 47, Exh. 81D, View. 





 32. In June of 1996, the McIntyres and WBC formalized their agreement, which was signed by WBC (but not the McIntyres) on July 15, 1996. In addition to agreeing to convey the sliver of subdivided land to WBC, the McIntyres agreed to cooperate with WBC should it choose to construct further docks on its property in the future. Specifically, the McIntyres agreed not to "oppose any applications for permits or approvals which the Boat Club shall seek in connection with the construction, installation, attachment and securing of the [dock] which the boat club may construct" nor to "object to the construction by the boat club of a [dock] no more than 22 feet in width along the southerly boundary line of said Mystic Lake and land with Winchester Boat Club, other than the easement location." Although the McIntyres and WBC had reached an easement agreement, the agreement was not recorded in the registry until March 18, 1998 at Book 28324, Page 61 (dock easement). Exhs. 1, 2, 3. 





 33. The dock easement granted the McIntyres: 





 a. The right and easement, in common with others now or hereafter entitled, to use the strip of land (the "Right of Way") is [sic] twelve (12) feet wide shown as "12' Right of Way" crossing Lot 2 on a plan...entitled "Plan of Land in Winchester, Mass. (Middlesex County)" dated April 9, 1994...for passage by foot between land now owned by the Grantee adjacent to the northerly boundary of Lot 2 [the Open Space Parcel]...and Mystic Lake, all as shown on said plan and the right and easement to store a canoe or small boat on the Right of Way; and 





 b. The right and easement to construct, install, attach, secure, and use a dock and/or float, no more than three (3) feet in width, along the southerly boundary line of the Right of Way into said Mystic Lake[.] 





 Exh. 3. 





 34. The recorded dock easement provided the following caveat to the dock rights: 





 The [dock rights] shall run with and benefit Lot 3 [the Property], but only to the extent that such rights and easements have been exercised during the period that the Grantee named herein is the owner of Lot 3. Any successor to such Grantee as owner of Lot 3 shall have the rights and easements set forth in Subsection (b) above only to the extent that such rights and easements were exercised by the Grantee named herein, except that such successor owner shall have the right to repair any docks and/or floats that were installed by the Grantee named herein. 





 Exh. 3. 





 35. While the dock was present on the shoreline at the southeastern corner of the Open Space Parcel, it was used both by the McIntyres and other members of WBC. The McIntyres would store their boats, including a kayak and a canoe, on the dock easement for extended periods. Members of WBC would use the dock to occasionally launch kayaks, canoes, or other small boats from the dock, but they would not leave boats on the dock for an extended time. Tr. I, 139:14-140:16, 141:2-142:10, 171:2-8.





 36. Having installed and used the dock on the southeastern corner of the Open Space Parcel during the time they owned the Property, I find that the McIntyres therefore satisfied the condition contained in the dock easement such that it runs with and benefits the Property. Exh. 3. 





 37. In April of 2008, Lawrence Beals - who was then in charge of harbors and docks at WBC - sent a letter to the Carrolls, WBC's and the McIntyres' neighbor to the east. The letter was partly in response to the Carrolls' request that the dock in the southeastern corner of the Open Space Parcel be removed. Mr. Beals wrote, "Having reviewed the [relevant] easement, I have concluded that the Winchester Boat Club does not have the right to remove that floating dock from its present location." Tr. III, 61:17-19. Exh. 52. 





 38. In his letter to the Carrolls, Mr. Beals also informed them that the chain link fence parallel to their common boundary with the boat club's Open Space Parcel was actually within the twelve-foot easement granted to the McIntyres in the dock easement, and not a marker of the actual location of the shared boundary line. Tr. III, 70:2-20. Exh. 52. 





 39. At some point, the chain link fence running parallel to the shared property line between the Carrolls' property and the Open Space Parcel was relocated to the actual boundary line between those properties. Tr. III, 84:2-9, 181:11-182-21. Exh. 138 at 14. 





 40. After the chain link fence was moved to the correct boundary line between the Open Space Parcel and the Carrolls' property, it became clear that the dock was not, in fact, within the twelve-foot easement granted to the McIntyres in the dock easement. Tr. II, 217:22-219:6. 





 41. In the minutes from a meeting of WBC's board of directors in April 2008, Mr. Beals informed the board of his communications with the Carrolls, wherein he informed them the dock was "located on the McIntyre's easement and is there as of right but in any case it is not located on property controlled by the club." Tr. III, 63:23-64:6. Exh. 133. 





 42. In March of 2009, WBC applied for permits that would allow for their temporary mooring of floats or rafts. The dock on the shore at the southeastern corner of the Open Space Parcel was included as one of the subject docks in the application. WBC has applied for these permits annually since 2009. Tr. III, 193:23-3. Exh. 139. 





 43. The McIntyres hosted an open house at the Property sometime before May 2014. The then-commodore of WBC, Beth Locke, attended the open house to make sure that the McIntyres were not, in her opinion, inappropriately representing their rights with respect to the dock easement and the dock. Tr. III, 73:20-11. Exh. 133. 





 44. Before the Ho/O'Donnells purchased the Property, they reviewed marketing materials for the Property that included remarks from the McIntyres regarding the use of "[their] dock." Tr. II, 156:18-157:1. Neither the Property's listing sheet nor the purchase and sale agreement for the Property referenced the dock at the shoreline to the south of the property. Tr. II, 221:14-23, 222:13-223:5. Exh. 50. 





 45. Ms. Ho testified that she was not informed, in communications with her real estate broker or with representatives of the McIntyres, that the dock was not included in the transaction. Mr. O'Donnell did, however, have concerns about whether the Ho/O'Donnells would need to get a permit for the dock. Tr. II, 156:3-16, 225:20-23. Exh. 132. 





 46. At the time that the McIntyres sold the Property to the Ho/O'Donnells in 2014, the dock remained attached to the southern boundary of the Open Space Parcel. The quitclaim deed conveying the Property, dated May 30, 2014, also conveys the easement rights to the 12-foot right of way, and the right to maintain a 3-foot dock at the end of the right of way, i.e., the dock easement. I find that the conveyance of the Property included the conveyance of the dock then attached to the right of way, as a chattel. The Ho/O'Donnells therefore own the dock. Tr. I, 75:22-76:2, Exh. 17. 





 47. After the Ho/O'Donnells purchased the Property, they did not immediately move into the house because of ongoing construction on the house for the purpose of adding an addition. However, the Ho/O'Donnells did begin going to the Property immediately after they purchased it to use the dock for fishing or other recreation. They would use the dock regularly during the warm months of 2014 and 2015. Tr. II, 143:13-143:17, 144:6-11, 144:20-145:6, 160:24-161. 





 48. On April 29, 2014, former WBC Commodore Carl Boerner emailed other members of WBC's management. He noted that "When the McIntyres lived [at the Property], they did use the dock" and opined that "[i]n some regards, maybe WBC should consider removing it" because it was in poor condition. Tr. 114:11-22. Exh. 135. 





 49. Another meeting of WBC's board of directors occurred on August 13, 2014. The minutes from that meeting included information from the Harbor and Docks overseer about the dock on the shore to the south of the Property. Specifically, the meeting minutes note that "[t]he dock at the far end of the [Open Space Parcel] does not belong to WBC. We have an easement to use it, but do not have authority to fix it. Easement said (sic) neighbor could build a dock, but they would be responsible for maintaining it." Tr. III 81: 10-25. Exh. 133. 





 50. The Ho/O'Donnells became members of WBC in July 2014, shortly after they purchased the Property. Tr. II, 193:8-12.





 51. Ms. Ho had conversations with WBC staff in 2014 and 2015 in which she mentioned her family's use of the dock, referring to it as "our dock." At that time, the staff members did not express any belief that the dock was, in fact, owned by WBC. Tr. II, 161:9-162:16, 162:19-164:4. 





 52. Ms. Ho testified that her family could not reach the dock using the deeded right of way in the dock easement because it was overgrown. Instead, they did "the same thing [their] predecessors did," which was walk through the open portion of the stone wall in the rear of their property and walk across the Open Space Parcel to the shoreline. At the shoreline, there was a short wooden gate through which the Ho/O'Donnells would pass to get to the dock. Tr. II, 145:13-146:24, 165:12-21. Exh. 81. 





 53. In the May 2016 Letter, WBC, in addition to discussing the stone wall, informed the Ho/O'Donnells of its position that WBC owned the dock on the shoreline to the south of the Property. This letter followed a conversation between Ms. Ho and then-WBC board member Jim Bowers, in which Mr. Bowers informed Ms. Ho that WBC was considering removing the dock. The letter also informed the Ho/O'Donnells that they were restricted to using and maintaining the 12-foot right of way, and could not clear any brush outside of that area 12 feet from WBC's boundary line. The letter did not mention that the dock was wider than what the dock easement allowed. Tr. II, 166:14-167:24. Exh. 53. 





 54. After receiving the May 2016 Letter from WBC, the Ho/O'Donnells stopped using the dock on the shore. Tr. III, 39:7-13.





 55. Shortly after WBC sent the May 2016 Letter to the Ho/O'Donnells, the club suspended the Ho/O'Donnells' membership. As a result, the Ho/O'Donnells were no longer able to travel from the opening in their rear stone wall and across the Open Space Parcel to the south, but had to rely on their deeded right of way in the dock easement. Tr. II, 179:19-180:3. 





 56. Ms. Ho prepared to clear the deeded right of way. Photos from summer of 2016 show that the twelve-foot easement area was hardly passable, and was populated by mature trees, brush, and bushes. Ultimately, WBC cleared the deeded easement area before Ms. Ho was able to clear it herself. Tr. III, 179:19-180:16, 183:11- 184:23. Exh. 138 at 15-19. 





 57. Also in May of 2016, Ms. Ho reached out to the McIntyres asking about their understanding of who owned the dock. In an email response to Ms. Ho's inquiry, Mr. McIntyre stated that he "[could not] say that the dock was deeded or formally given to [the McIntyres] or that [they] had marketable title to it." Tr. II 226:12- 227:12, 228:7-20. Exh. 62. 





 58. At some point in the summer of 2016, stakes appeared along the western border of the twelve-foot right of way - that is, the border opposite the fence along the Carrolls' property. Neither Ms. Ho nor Mr. Beals could recall who had inserted those stakes. The position of the stakes along the western boundary of the right of way demonstrates that at this time in 2016, the dock was located a few feet to the west (outside) of the right of way of the dock easement. Tr. II, 171:4-172:21, 212:17-213:7, 217:17-219:6. Exhs. 47C, 81.





Trespass Claim 





 59. When the McIntyres purchased the Property, their driveway was located on the northwestern side of the lot, the side closest to the Open Space Parcel. The McIntyres had the driveway moved to the northeastern side of their lot. Mrs. McIntyre had hedges planted along the northwestern boundary of the Property where the driveway had previously been located. Tr. I, 178:7-18. Exh. 14A. 





 60. Where the hedges along the front of the Property ended (as planted by Mrs. McIntyre), a stone wall began. The wall continued over the common boundary line between the Property and the adjacent Open Space Parcel to the west, and from there ran parallel to Everett Avenue along the northwestern boundary of the Open Space Parcel. Tr. I, 179:12- 21. Exhs. 14A, 14G. 





 61. In connection with the formal agreement between the McIntyres and WBC, WBC erected a number of arborvitae trees in a north-south line along the new boundary line, where the Open Space Parcel's northeastern edge met the McIntyre's western boundary line. The trees were intended to act as a screening barrier between the properties, and were planted by Peter Wild just inside the shared boundary line, on the Open Space Parcel. The arborvitae hedging began a number of feet to the south of the stone wall that ran along Everett Avenue. Tr. I, 180:8-13, TR. II, 42:11-18. Exhs. 40, 100A. 





 62. While the McIntyres lived at the Property, Mrs. McIntyre planted and maintained a number of ornamental trees and shrubs in the northwestern corner of their lot. Mrs. McIntyre also planted a catalpa tree in this area, on what she believed to be the Property side of the shared boundary line between that Property and the abutting Open Space Parcel. Mrs. McIntyre testified that she based her understanding of where the Property ended on both the presence of a metal spike driven into the ground at the northwestern corner of the Property and on the location of the arborvitae planted further south on the common boundary line. Tr. I, 179:12-21, 181:25-182:2, Tr. II, 7:7-7:18, 10:1-12:16, 41:4-42:9. Exh. 14G. 





 63. Mrs. McIntyre's maintenance of the plantings in this area included cutting back vines that damaged the ornamental plantings. The vines were also present on WBC's side of the shared boundary line, but Mrs. McIntyre did not weed or cut back the vines on the WBC owned Open Space Parcel. Tr. I, 185:23-186:20, Tr. II, 17:3-19. Exh. 14G. 





 64. Mrs. McIntyre testified that during the time she lived at the Property, the only plants on the boat club side of the northwestern corner of her lot were vines, wild seedlings, and some weedy shrubs, but no ornamental plantings. Tr. II, 22:4-7, 24:2-23, 32:19-33:9, 57:13-59:8. 





 65. Mr. Beals testified based on his observations that before any vegetation was removed from the common boundary line area, there was a dense vegetative buffer between the Property and the Open Space Parcel where they met along Everett Avenue. Tr. III, 170:20-171:4. Exh. 47H. 





 66. James Bowers, who has held multiple leadership positions at WBC and is currently a member of the club, also testified that before any vegetation was removed in the disputed common boundary area along Everett Avenue, the plantings there acted as a screen or buffer obscuring the Property from view. Tr. IV, 13:5-22, 16:3-22. Exhs. 47H, 47I. 





 67. Land surveyor Glen Odone testified, about exhibit 4C, that in his practice, reference on a topographic plan to "brush" - rather than to "shrubs" - indicates that plants in the marked area are wild rather than planted. I credit this testimony that the plantings portrayed on exhibit 4C in the extreme northeastern corner of WBC's Open Space Parcel (along Everett Avenue), labeled as brush, were likely wild and un-maintained, not ornamental or landscaped shrubbery, as of the date the plan was revised in 2009. The plan does not show any of Mrs. McIntyre's trees on the WBC side of the boundary. Tr. II, 139:16- 140:1. Exh. 4C. 





 68. After the Ho/O'Donnells purchased the Property, they hired a surveyor, Wes Guillaume of GRE Surveying, to stake the Property, including the northwestern corner of the lot where there were landscaped plantings. This occurred in the fall or winter of 2014. Tr. II, 188:10-189:1, 190:11-20; Tr. III, 10:9-12. Exh. 45. 





 69. About a year after the staking was done, the Ho/O'Donnells' contractor, Mr. Weishan, oversaw removal of some plants in the northwestern corner of the Property, for the purpose of enabling construction vehicles to access certain parts of the Property. The Ho/O'Donnells relied on Mr. Weishan to determine which plants were on their side of the property line in connection with the plant removal, using a survey of the property. Tr. III, 12:5-25, 16:7-18, 21:12-15. 





 70. Ms. Ho also arranged to have some of the removed plants in the northwestern corner of the lot transplanted to other areas on the property. Tr. II, 189:3-15, 243:9-18. 





 71. As part of the alterations the Ho/O'Donnells were making to the Property after they purchased it, they hired stone mason Jack Cleary to do work on the front wall on the Property along Everett Avenue. He was hired to extend the stone wall to the east, where there had previously been hedging. Tr. II, 86:9-11. Exhs. 14C, 47I, 47J, 47K. 





 72. In connection with this project, Mr. Cleary asked WBC for permission to use the northeastern corner of its Open Space Parcel for staging of his masonry equipment. Mr. Cleary testified that he informed Ms. Ho of his intention. Mr. Cleary received permission from WBC leadership to stage in the area, and set up his cement mixer and tools on a bare spot of the area after laying down plywood. Ms. Ho testified that she did not learn of this arrangement until after it had already occurred. To the extent that Mr. Cleary and Ms. Ho have differing memories of their communications about the staging on the boat club property, I credit Mr. Cleary's testimony and find that he informed Ms. Ho of his intentions to seek permission from WBC before proceeding to set up staging on the Open Space Parcel. Tr. II, 86:12-87:2, 100:6-1, 100:19-24; Tr. III, 21:6-11. 





 73. Mr. Cleary observed that there were no ornamental shrubs or trees in the staging area, just some poison ivy and vines as well as some bare areas and spots covered with leaves. No one at WBC asked him to move his equipment during the few weeks that he had it staged on the Open Space Parcel. Tr. II, 87:18-21, 88:1-18, 104:14-20. 





 74. Photographic evidence from the time that Mr. Cleary was using this part of the Open Space Parcel as a staging area shows that by that time, there were few - if any - plantings, be they wild or cultivated, in the area between the arborvitae along the shared boundary line and the stone wall along Everett Avenue. Exh. 47K, 47L. 





 75. Not long after Mr. Cleary set up his staging area on the Open Space Parcel, Jim McGowan from WBC informed Ms. Ho that she (or someone in her employ) had destroyed landscaping in that staging area. Tr. III, 21:23-14. 





 76. In the May 2016 Letter, WBC formally expressed its concern about vegetation they believe was removed from their land that abuts the northwestern corner of the Property. The letter erroneously describes the northwestern vertex of the Property as beginning at the point where the privet hedging formerly ended and the stone wall formerly began. Tr. III, 90:23-91:11; Tr. IV, 36:1-37:14. Exhs. 4C, 14A, 53. 





 77. On June 1, 2016, Precision Land Surveying marked various points on the Open Space Parcel's boundary lines. This included marking the boundary line between the Open Space Parcel and the Property along Everett Avenue. This point - where WBC's Open Space Parcel along Everett Avenue ends and the Property begins - was marked with red paint where there was a drillhole, and a stake. I credit the work of this surveyor, and find that the boundary line between the properties is slightly to the east of the current bollard in the stone wall along Everett Avenue. Tr. III, 158:24-159:19. Exh. 138. 





 78. After the red paint was used to mark the boundary between the Open Space Parcel and the Property, a new concrete sidewalk was poured at a higher elevation than the former sidewalk. As a result, the paint marking is no longer visible. Tr. III, 164:5-14. View. 





 79. In photos from June 2016, the disputed area on the Open Space Parcel's uppermost northeastern corner appears partly empty of vegetation, covered with the same mulch that is used on the Property. This lack of vegetation is consistent with the photos taken when Mr. Cleary set up his masonry staging on the Open Space Parcel. Exhs. 47J-47K, 138. 





 80. Because the surveying work done by Mr. Guillaume and Precision Land Surveying was done after the landscaping in the disputed area was removed, there are no photographs portraying stakes or markers on the shared boundary line in relation to the former vegetation in the area. Mr. Beals testified that the painted drillhole mark he saw sprayed onto the boundary line between the properties, on Everett Avenue, was located near where there had previously been a Y-shaped crack in the concrete sidewalk along Everett Avenue. According to Mr. Beals, the painted drillhole was on the left side of a large rock on the wall, located next to the Y-shaped sidewalk crack. Photos of the wall after landscaping was removed and after staking was completed on the boundary line credit Mr. Beals' testimony, and show the boundary stake in place on the left edge of a large rock in the stone wall. Tr. III, 171:9-20. Exhs. 47H, 47I, 14C, 18, 19. 





 81. There are no clearly discernible photographs of the disputed area showing both the large rock in the stone wall and the previously dense vegetation. 





 82. WBC was unable to demonstrate by credible evidence precisely what trees, shrubs, or other plantings they allege were destroyed by the Ho/O'Donnells or their workers. WBC did produce an estimate of the cost to install numerous new plantings in the disputed area, and Mr. Bowers testified that this landscaping was meant as "restoration" of the former vegetation. However, neither Mr. Bowers nor anyone else credibly testified that the new, supposedly restorative plantings were in any way an accurate representation of whatever landscaping was previously in the area. Tr. IV, 19:3-24. Exh. 40. 





 83. There is additional doubt as to whether WBC's plans to insert landscaping in the northeast corner of its Open Space Parcel (where they believed Ms. Ho destroyed plantings) were actually meant to replace previously existing landscaping. Email communications among WBC management suggest that the planned landscaping was to be undertaken for the purposes of obscuring the addition the Ho/O'Donnells built onto their home. Tr. IV, 40-13-41:16. Exh. 136. 





 84. The current landscaping in this area of the Open Space Parcel is dissimilar from the landscaping seen in photos from 2014 before any vegetation was removed. Even assuming the removed vegetation seen in the 2014 photographs had been on WBC's side of the boundary line, WBC's plans for and installation of new landscaping does not replicate what existed there before. Tr. IV, 48:1-50:11. Exhs. 14G, 40. View. 





 85. An invoice sent to WBC from J&J Landscaping and Irrigation refers to the installation of an irrigation system "to accommodate new planting bed" in the disputed area. I find this invoice credible and further find that WBC did not maintain any irrigation in this area before it was installed by J&J Landscaping and Irrigation in October 2016. Tr. IV, 51:9- 24. Exh. 72. 





Discussion 





 I. Adverse Possession 





 "Title by adverse possession can be acquired only by proof of nonpermissive use which is actual, open, notorious, exclusive and adverse for twenty years." Kendall v. Selvaggio, 413 Mass. 619 , 621-622 (1992), quoting Ryan v. Stavros, 348 Mass. 251 , 262 (1964); G. L. c. 260, § 21. The person claiming title has the burden of proving adverse possession, and this burden "extends to all of the necessary elements of such possession." Mendonca v. Cities Serv. Oil Co. of Pennsylvania, 354 Mass. 323 , 326 (1968) quoting Holmes v. Johnson, 324 Mass. 450 , 453 (1949); Lawrence v. Town of Concord, 439 Mass. 416 , 421 (2003). 





 After weighing all of the evidence, I find that the Ho/O'Donnells have title by adverse possession to that area enclosed within the stone wall in the southwestern corner of their yard, including the area occupied by the stone wall. The Ho/O'Donnells proved at trial that the original stone wall constructed by Mr. McIntyre existed in that location continuously for the statutory 20- year prescriptive period, and that their existing stone wall fits the same footprint as the original. As detailed below, I find that they have met their burden of proving adverse possession.





 A. Continuous Use 





 The Ho/O'Donnells and their predecessors in title, the McIntyres, continuously used the area of land enclosed by a stone wall that encroached beyond their southeastern property line. Exh. 129. WBC argues that because the McIntyres did not "use" that area very often, the Ho/O'Donnells cannot succeed on their adverse possession claim. I disagree. Keeping a physical object on the ground is use, and enclosing an area is undoubtedly use. See LaChance v. First Nat'l Bank & Trust Co., 301 Mass. 488 , 491 (1938) ("The filling of the land and the erection of the wall were permanent improvements indicative of an intention upon the part of the occupants to use and appropriate the land to their own benefit and to the exclusion of all others.") The wall was constructed by the McIntyres, at some point after they acquired the Property in 1990, but before WBC installed yews behind the wall in May of 1994. Tr. I, 116:7-18. Mr. McIntyre would periodically repair the dry stacked wall when necessary. Tr. I, 114:4-13. There the wall remained until sometime in 2015, when Mr. Cleary, a stonemason, was hired by the Ho/O'Donnells to reconstruct the wall. Tr. II, 89:1-24, 1:25-182:13, 184:18-21. Mr. Cleary replaced the portion of the wall that had encroached on WBC's property in the exact footprint it had already occupied for over 21 years, albeit three or four feet shorter in length than the original wall. Tr. II, 92:20- 93:8, 127:17-128:7; Exh. 129. 





 I find that the total encroachment of 54 square feet has been continuously used in excess of the statutory 20-year period, as a result of the stone wall being in place and enclosing that area to the exclusion of WBC since at least 1994. 





 B. Open and Notorious Use 





 "The purpose of the requirement of 'open and notorious' use is to place the true owner 'on notice of the hostile activity of the possession so that he, the owner, may have an opportunity to take steps to vindicate his rights by legal action." Lawrence, 439 Mass. at 421, quoting Ottavia v. Savarese, 338 Mass. 330 , 333 (1958). Explicit notice of adverse use is not required. Id.; Ottavia, 338 Mass. at 334 ("Where the user has acted, without license or permission of the true owner, in a manner inconsistent with the true owner's rights, the acts alone . . . may be sufficient to put the true owner on notice of the nonpermissive use."); Poignard v. Smith, 23 Mass. 172 , 178 (1828) (where true owners were both out of the state, adverse possession was still found because "acts of notoriety, such as building a fence round the land or erecting buildings upon it, are notice to all the world"). "Open and notorious use of a property is thus deemed to place the true owner on constructive notice of such use, and it is immaterial whether the true owner actually learns of that use or not." Lawrence, 439 Mass. at 422. For use to be open, "the use must be without attempted concealment;" to be notorious, "it must be sufficiently pronounced so as to be made known, directly or indirectly, to the landowner if he or she maintained a reasonable degree of supervision over the property." Boothroyd v. Bogartz, 68 Mass. App. Ct. 40 , 44 (2007). 





 Here, the McIntyres' and the Ho/O'Donnells' use of WBC's land could not have been more open and notorious - it is, and has always been, in plain sight. View. Building a wall upon another's property is "notice to all the world," Poignard, 23 Mass. at 178, and thus WBC was charged with knowing that the wall was upon WBC's property, without its permission. No one from WBC ever objected to the stone wall's presence over the boundary line. Tr. I, 114: 7-16. Having found that the encroaching portion of the wall has been in existence, first as a dry stacked wall, and then as a stone and mortar wall, since at least 1994, I find that the use by the McIntyres and the Ho/O'Donnells was open and notorious for the requisite statutory period.





 C. Exclusivity 





 "A claimant's use is 'exclusive' for purposes of establishing title by adverse possession if such use excludes not only the record owner but 'all third persons to the extent that the owner would have excluded them.'" Brandao v. DoCanto, 80 Mass. App. Ct. 151 , 158 (2011), quoting Peck v. Bigelow, 34 Mass. App. Ct. 551 , 557 (1993). To demonstrate exclusivity, "[s]uch use must encompass a 'disseisin' of the record owner." Peck, 34 Mass. App. Ct. at 557. "That is to say, a use or possession which is not adverse to the owner, or which is concurrent with that of others, or which does not exclude a similar use or possession by others, will not confer a title in fee, however long continued." Eastern R. Co. v. Allen, 135 Mass. 13 , 16 (1883). "Acts of enclosure or cultivation are evidence of exclusive possession." Labounty v. Vickers, 352 Mass. 337 , 349 (1967). 





 Here, there is no evidence that WBC somehow used the space behind the encroaching wall on the side of the McIntyres' and Ho/O'Donnells' yard. The encroaching wall, angled off of the east-west-running wall along the southern border of the Property, effectively enclosed the McIntyres' and Ho/O'Donnells' yard, and still serves the same purpose today. Exh. 129, View. Such enclosure serves as evidence of exclusive possession, by barring access to the true owner. Labounty, 352 Mass. at 349; LaChance, 301 Mass. at 491. I find, therefore, that the wall served to exclude WBC as well as "all third persons," since before 1994, and did so until the filing of this case in 2016. Peck, 34 Mass. App. Ct. at 557. 





 D. Adverse/Non-permissive Use 





 The essence of adverse possession is that the possessor's use of the land must be adverse or hostile to the true owner, meaning that the use is without permission of the owner. Totman v. Malloy, 431 Mass. 143 , 145 (2000). "The essence of nonpermissive use is lack of consent from the true owner." Id.; Ottavia, 338 Mass. at 333-334. Accordingly, if the true owner gives permission to use their land, there can be no adverse possession. Kendall, 413 Mass. at 623. "One's use of another person's property is adverse to that person if the manner of his use and the circumstances thereof demonstrate that he does not recognize or consider himself to be subject to an authority in that person to prevent his use of the property." Bills v. Nunno, 4 Mass. App. Ct. 279 , 284 (1976). "It is well established in Massachusetts that permissive use based on a mutual mistake as to the location of a boundary line will not defeat a claim of adverse possession." Kendall, 413 Mass. at 622. The possessor's subjective state of mind or intent is irrelevant to a claim of adverse possession. Id. at 623. One can obtain title by adverse possession even if he or she does not intend to deprive another of property. Flynn v. Korsack, 343 Mass. 15 , 19 (1961); Van Allen v. Sweet, 239 Mass. 571 , 574-575 (1921). Thus, even if the possessor believes their use is permissive because of a mistake as to titles or the location of a boundary line with adjoining land, their claim is not defeated so long as the nature of the use and resulting occupancy of the land is sufficient to indicate adversity. Kendall, 413 Mass. at 622-623; Boutin v. Perreault, 343 Mass. 329 , 331-332 (1961). 





 Here, there was no evidence presented at trial that the McIntyres' and the Ho/O'Donnells' use of the 54 square feet of land beyond the southwestern border of the Property was anything other than non-permissive. There was no evidence that their use was by permission of WBC, or by any kind of agreement. Kendall, 413 Mass. at 623. Even if the use had been a result of a mutual mistake as to the boundary line, such a mistake would not defeat the Ho/O'Donnells' claim. Id. at 622. Rather, the nature of the McIntyres' and the Ho/O'Donnells' use of the subject area is sufficient to indicate adversity. By enclosing the area of WBC's property with a stone wall, and periodically maintaining that wall, the McIntyres demonstrated that they did not "consider [themselves] to be subject to an authority in [WBC] to prevent [their] use of the property." Bills, 4 Mass. App. Ct. at 284; Tr. I, 114: 10-16. In the 20 years in which the McIntyres maintained the stone wall beyond the border of the Property, no one from WBC ever informed them of its encroachment, or objected to its placement. Tr. I, 114:7-16. Later on, when the Ho/O'Donnells hired Mr. Cleary to replace the dry-stacked stone wall, that use of the subject area further demonstrated that they did not consider themselves restricted in the use of that property. Bills, 4 Mass. App. Ct. at 284; Tr. II, 89:1-24, 1:25-182:13, 184:18-21. I find that, starting when the encroaching wall was constructed sometime between 1990 and 1994, and at least until 2015, when the wall was replaced, the use of WBC's property was adverse and non permissive. 





 I find, based on the evidence, that the McIntyres and the Ho/O'Donnells occupied and used the 54-square feet enclosed by the stone wall just beyond the southwestern corner of the Property adversely, openly, notoriously, exclusively, and continuously between 1994 and 2016, a period of more than twenty years. Twenty years from 1994 is 2014. Thus, the Ho/O'Donnells have established title by adverse possession to this area, title that ripened in 2014. 





 II. Trespass 





 In the Counterclaim, WBC has brought a claim of trespass against the Ho/O'Donnells. WBC alleges that the Ho/O'Donnells have trespassed upon the Open Space Parcel with respect to the area enclosed by the stone wall, the stone steps, and the alleged destruction of landscaping in the northeastern corner of the Open Space Parcel, and seeks damages. Those claims were tried to me. The Counterclaim made additional counterclaims of trespass that were not addressed at trial, or in WBC's post-trial brief. Such claims in the Counterclaim, to the extent they were not addressed, are therefore waived, and will be dismissed with prejudice.





 "A trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it." Amaral v. Cuppels, 64 Mass. App. Ct. 85 , 91 (2005), quoting Restatement (Second) of Torts § 821D comment d (1979) (Restatement). The entry must be made without the possessor's consent or some other privilege or right to do so. Gage v. Westfield, 26 Mass. App. Ct. 681 , 695 n.8 (1988). The entry must be an affirmative voluntary act, or the result of an affirmative voluntary act. United Elec. Light Co. v. Deliso Constr. Co., 315 Mass. 313 , 318 (1943). A plaintiff who proves that the defendant committed an intentional, unprivileged trespass to his real property is entitled to recover nominal damages, even if no actual damage is shown. Lawrence v. O'Neill, 317 Mass. 393 , 395 (1944); Metropoulos v. MacPherson, 241 Mass. 491 , 503 (1922). 





 To prevail in an action for trespass, the plaintiff must show that he or she had actual possession of the real property or a right to possession of the property at the time of the trespass. Federal Nat'l Mortgage Ass'n v. Gordon, 91 Mass. App. Ct. 527 , 535-538 (2017); Attorney Gen. v. Dime Sav. Bank of New York, FSB, 413 Mass. 284 , 288 (1992). One is in possession of land if he or she (1) is in occupancy with intent to control the property, (2) was formerly in occupancy with intent to control if no other person has obtained possession, or (3) has the right to immediate occupancy if no other person is in possession. Restatement (Second) of Torts § 157 (1965). As I have found that the Ho/O'Donnells have acquired title by adverse possession to the 54 square feet that is occupied by the southwestern angled portion of the stone wall, WBC's claim of trespass as to that area of land must be dismissed. 





 A. The Stone Step 





 The stone wall at the southern boundary of the Property (the part that is not the subject of the adverse possession claim) lies entirely within the Property. Exh. 129. However, the Ho/O'Donnells, like the McIntyres before them, left a small opening in the wall leading to the Open Space Parcel. Id. In order to accommodate the grade change between the Ho/O'Donnells' back yard and the Open Space Parcel, the Ho/O'Donnells installed a set of steps in the break in the wall, the lowest of which encroaches onto the Open Space Parcel. Tr. III, 179:18-180:3; Exh. 138 at 11; Exh. 129. View. The Ho/O'Donnells presented no evidence at trial that they had any permission to lay that step on WBC's property, nor did they present any evidence of adverse possession of the property underlying the step. Therefore, the placement of the step is an unprivileged invasion and continuing trespass of WBC's property, and must be removed. I am obligated to award at least nominal damages for the trespass. Lawrence, 317 Mass. at 395; Metropoulos, 241 Mass. at 503. I award WBC nominal damages in the amount of $100.00. 





 B. The Landscaping 





 WBC has alleged that the Ho/O'Donnells or their agents trespassed on their property and destroyed landscaping in the northeastern corner of the Open Space Parcel along Everett Avenue. While there remains no dispute as to where the Open Space Parcel ends and the Property begins, Exhs. 4, 138, WBC has failed to prove that the Ho/O'Donnells have committed an "intentional, unprivileged trespass" to the northeastern corner of the Open Space Parcel. Lawrence, 317 Mass. at 395; Metropoulos, 241 Mass. at 503. WBC was unable to demonstrate precisely what trees, shrubs, or other plantings were destroyed by the Ho/O'Donnells or their workers in the course of their landscaping work. Furthermore, Mr. Cleary asked and received WBC's permission to stage in the Open Space Parcel, and testified that there was nothing there to destroy, just some poison ivy and vines. Tr. II, 86:12-88:18; Exhs 47K, 47L. An entry made with the consent of the owner is not a trespass, Gage, 26 Mass. App. Ct. at 695 n.8, and a "license. . . excuses acts done by one on land in possession of another that without the license would be trespasses." Baseball Publ. Co. v. Bruton, 302 Mass. 54 , 55 (1938). Mr. Cleary, having received permission to enter WBC's property in the northeast corner to stage his cement mixer for construction of the stone wall, did not commit trespass. 





 WBC has also failed to present evidence of damages. While it has provided invoices for landscaping work done in the northeastern corner of the Open Space Parcel, WBC presented no evidence that those invoices reflected work that restored the parcel to its prior condition - instead, it appears WBC added landscaping features, including new irrigation, that were not there to begin with. Tr. IV, 48:1-50:11, 51:9-24; Exhs. 14G, 40. I credit testimony from the land surveyor Mr. Odone, that as of 2009, the plants growing on the other side of the McIntyre's property were wild and unmaintained. Tr. II, 139:16-140:1, Exh. 4C. I also credit Mrs. McIntyre's testimony that the only plants on WBC side of the boundary were vines, wild seedlings, and some weedy shrubs. Tr. II, 22:4-7, 24:2-23, 32:19-33:9, 57:13-59:8. Having failed to provide any evidence that the Ho/O'Donnells or their workers entered their property without privilege, or any evidence of property damage thereby, WBC's counterclaim of trespass as to the northeast section of the Open Space Parcel will be dismissed. 





 C. Concrete Rubble 





 In addition to the alleged destruction of landscaping, WBC also alleged that the Ho/O'Donnells committed trespass by discarding cement concrete rubble onto the Open Space Parcel. Answer at 11. The only evidence presented was testimony by Mr. Boerner that there was some concrete on the Open Space Parcel behind the Everett Avenue stone wall, and also between WBC's bocce court and the arborvitaes. Tr. III, 187:17- 188:10; Exh. 61. I do not credit this testimony. Neither Mr. Boerner, nor any witness, testified that they observed the concrete discarded by the Ho/O'Donnells or their agents. WBC did not establish that the concrete in those locations was placed there intentionally by the Ho/O'Donnells or their agents, nor did WBC quantify any damages from the alleged trespass. For these reasons, the counterclaim of trespass relating to the concrete is dismissed with prejudice. 





 III. Easement Rights 





 In exchange for granting WBC a strip of land, the McIntyres received from WBC the dock easement, consisting of an easement to access Mystic Lake across the Open Space Parcel, as well as to build a dock at the end of the granted right of way. Exhs. 1-3. The McIntyres signed the quitclaim deed conveying the strip on August 14, 1996, and WBC signed the dock easement on July 15, 1996. Id. The dock easement granted to the McIntyres (a) a twelve-foot right of way along the eastern border of the Open Space Parcel to pass from the Property to Mystic Lake, and (b) the right to "construct, install, attach, secure, and use a dock and/or float, no more than three (3) feet in width, along the southerly boundary line" of said right of way. Exhs. 1, 3. The dock easement was recorded on March 18, 1998, and has not been modified by written agreement since. Exh. 3. 





 The dock easement provided that the dock rights would pass to the McIntyres' successors-in-title, but "only to the extent that such rights and easements have been exercised" during the McIntyres' ownership of the Property. Id. As I have found after trial, those rights were exercised by the McIntyres, beginning even before the execution of the dock easement on July 15, 1996, and therefore passed to the Ho/O'Donnells when they purchased the Property in 2014. Unless those rights have been extinguished or expanded by prescriptive use over the 20-year statutory period, the Ho/O'Donnells are entitled to full use and enjoyment of the dock easement. 





 Acquiring an easement by prescription "requires continued, uninterrupted use of that easement for twenty years." G. L. c. 187, § 2. As with adverse possession, the use must be open, notorious, continuous, and adverse." Rotman v. White, 74 Mass. App. Ct. 587 , 589 (2009). Unlike in adverse possession, lack of exclusive use does not preclude the acquisition of an easement by prescription. Labounty, 352 Mass. at 349. The state of mind of the claimant is not relevant "to a determination whether the [use] of land is nonpermissive." Totman, 431 Mass. at 146. "[T]hat an owner allows use because of the mistaken belief that the user has title or an easement does not defeat a prescriptive easement claim." Barnett v. Myerow, 95 Mass. App. Ct. 730 , 739 (2019). 





 As detailed below, I find that the Ho/O'Donnells have an easement by prescription for a dock of the same width of the existing dock -that is, wider than is permitted by the dock easement. However, they have not met the statutory time period to prescriptively relocate the existing right of way. The dock must therefore be moved to the southern boundary of the original right of way, but may remain wider than the 3-foot restriction in the recorded dock easement. 





 A. The Right of Way 





 The Ho/O'Donnells argue that the right of way has been deemed relocated. In Massachusetts, an easement "may be deemed relocated when the conduct of the parties is such as to permit a conclusion that a different easement had 'been substituted for the way mentioned in the deeds' because the evidence reflects 'a tacit understanding or an implied agreement,' manifested by the dominant owner's 'acquiescence' in the use of the different easement in lieu of the original for a number of years." Proulx v. D'Urso, 60 Mass. App. Ct. 701 , 705 (2004), quoting Anderson v. DeVries, 326 Mass. 127 , 132-133 (1950). 





 Here, WBC did not "acquiesce" to the use of a different easement, so much as WBC also mistook the chain link fence separating the Open Space Parcel from the Carroll property for the eastern boundary of the Open Space Parcel. As a result, both WBC and the McIntyres had a mistaken understanding concerning the boundary of the easement, which extended 12 feet to the west from the true property line. It could not be said that WBC allowed the McIntyres to "substitute" the right of way granted in 1996 for a right of way 12 feet from the chain link fence, as neither party to the easement agreement knew (until sometime in 2008) that the chain link fence was not the boundary, and that therefore the right of way was not where they thought it was. 





 Nor has the right of way been relocated to a path across the lawn of the Open Space Parcel from the small break in the wall used by the McIntyres and by the Ho/O'Donnells when they were members of WBC. The McIntyres and the Ho/O'Donnells were allowed to cross the Open Space Parcel outside of the right of way by permission of WBC, as members. Ms. Ho testified that she stopped crossing the Open Space Parcel outside of the right of way once her membership was revoked. Tr. II, 179:19-180:3. There was no "tacit" understanding of a relocation of the right of way, only permission by WBC for their members to use the Open Space Parcel to access the dock. 





 Whether, however, the Ho/O'Donnells have acquired an easement by prescription for a right of way extending twelve feet from the chain link fence is a closer question. Both parties were mistaken about the location of the right of way, and mistaken use is consistent with adverse use. Barnett, 95 Mass. App. Ct. at 739. Use of a twelve-foot-strip of land parallel to the chain link fence, which exceeds the width of the actual right of way, is adverse to the rights granted. Use of the mistaken right of way was also continuous, as Mr. McIntyre testified that he always thought the right of way extended twelve feet from the chain link fence. Tr. I, 167:9-17. Since the dock was located outside of the true right of way, the use of the mistaken right of way would have been open and notorious. 





 The evidence is, however, and I find, that the McIntyres and the Ho/O'Donnells failed to use the mistaken right of way for the required 20-year statutory period. First, the easement agreement entered into as of 1996, while it contained the three-foot-wide restriction on the dock, does not say anything about a twelve-foot width of the right of way, and locates the easement by way of reference to an "Exhibit B" which is not attached to Exhibits 1 or 2. The twelve-foot width description appears for the first time in the recorded dock easement, dated February 25, 1998. Exh. 3. Therefore, the use adverse to the easement only began in 1998. Because the filing of a complaint to establish title to land will end the prescriptive period, and the Ho/O'Donnells filed their complaint in this case in November of 2016, the prescriptive period was cut off after only 18 years had passed. Pugatch v. Stoloff, 41 Mass. App. Ct. 536 , 542 n.8 (1996). 





 Second, even if the "Exhibit B" referenced in the 1996 easement agreement restricted Mr. McIntyre's right of way to a twelve-foot strip of land along the eastern boundary of the Open Space parcel, such that his use of the twelve feet to the west of the chain link fence was adverse as of July 15, 1996, the prescriptive period was cut off prior to July 15, 2016. In order to interrupt the prescriptive period, a party must assert their rights by some "unequivocal, 'overt act, which, if the easement existed, would be a cause of action.'" Ryan, 348 Mass. at 264, quoting Brayden v. New York, New Haven & Hartford R.R. Co., 172 Mass. 225 (1898). The May 2016 Letter the WBC sent to the Ho/O'Donnells claimed ownership of the dock and asked the Ho/O'Donnells to refrain from maintaining or using the area on the Open Space Parcel outside of the right of way extending twelve feet from the boundary line. Exh. 53. The May 2016 Letter further described the dock as lying "near" the end of the right of way, but not within it. Id. This was a sufficiently "overt act" to interrupt the prescriptive period. Therefore, even if the adverse use began in July of 1996, it was interrupted by May of 2016, just two months shy of the statutory 20-year period. For that reason, the Ho/O'Donnells have not obtained an easement by prescription for a right of way outside of the grant in the recorded dock easement. 





 B. The Dock 





 I have found that the Ho/O'Donnells own the dock. The dock is 5-6 feet wide, wider than the three-foot limit set forth in the dock easement. They argue that the three-foot width restriction of the dock easement has been extinguished by adverse use. "To extinguish easement rights, a servient tenant's adverse acts must render use of an easement 'practically impossible for the [twenty-year] period required for prescription.'" Post v. McHugh, 76 Mass. App. Ct. 200 , 204-205 (2010), quoting New England Home for Deaf Mutes v. Leader Filling Stations Corp., 276 Mass. 153 , 159 (1931). Here, the Ho/O'Donnells are the dominant tenant of the easement. Extinguishment, therefore, is not the proper legal theory under which they have expanded their rights under the existing easement. 





 Rather, the question is whether the Ho/O'Donnells have acquired an easement by prescription to maintain a dock in excess of the three-foot width restriction at the end of the right of way. The first inquiry is whether the use was adverse. It is the possessors' actions, and not their intent, that provide notice of nonpermissive use to the true owner. Kendall, 413 Mass. at 624 (clarifying that the central inquiry for finding whether a use is permissive or adverse should be whether consent was given to the adverse claimant for using the land at issue, and that the adverse claimant's mental state is irrelevant to finding that his use was hostile). The unexplained use of an easement will be presumed to be adverse, and will be sufficient to establish title by prescription and to authorize the presumption of a grant. Truc v. Field, 269 Mass. 524 , 528-529 (1930). Evidence of express or implied permission rebuts the presumption of adverse use. Spencer v. Rabidou, 340 Mass. 91 , 93 (1959). Here, there was no evidence before me that WBC specifically waived the three-foot restriction or otherwise gave permission to the McIntyres or the Ho/O'Donnells to leave the wider dock in place. The use of a wider dock than allowed under the easement was unexplained, other than by mere convenience. I find that the use was adverse. 





 Next, the use must have been continuous. The dock was installed sometime in 1991 or 1992, and the same dock was in place at the time of the view. There is no evidence before me that the dock was ever removed from its present location on the southern shore of the Open Space Parcel after it was installed, save for some occasional mishaps during bad weather. I find that as of the time of installation until the beginning of trial, the oversized dock has continuously exceeded the scope of the easement. 





 The use of the 5-6 foot wide dock could not have been more open and notorious. It is clearly visible from WBC's Open Space Parcel, as well as from the open water where it conducts activities. View. WBC itself gave the dock to the McIntyres from their surplus back in 1991 or 1992, and the dock has been visible and known to WBC since then. WBC would have known that the dock was greater than 3 feet wide, having used it themselves for a number of years before affixing it to the Open Space Parcel. 





 The final question is whether the above elements were met for the full 20-year statutory period. The adverse use of the wide dock did not begin when the dock was installed, because at that time, there was no easement agreement limiting the width of the dock. Before the easement was written, the use of the wider dock was by WBC's permission. (At the very least, there is no evidence in the record that the 3-foot width restriction was a part of the oral agreement in effect until 1996.) The agreement was first entered into and signed by WBC on July 15, 1996. Exh. 1. At that time, the maintenance of the 5-6 foot-wide dock became adverse to the easement language, which restricted the McIntyres to using a three-foot wide dock. It is uncontested that the same dock which WBC gifted to Mr. McIntyre sometime in 1991 or 1992 is the one that remains in place today. The question is when the prescriptive period ended. 





 Once again, in order to interrupt the prescriptive period, a party must assert their rights by some unequivocal, overt act. Ryan, 348 Mass. at 264. The filing of a complaint to establish title to land will end the prescriptive period. Pugatch, 41 Mass. App. Ct. at 542 n.8. Here, the Ho/O'Donnells filed their suit in this case on November 14, 2016. There was no evidence presented at trial that WBC objected to the Ho/O'Donnells' maintenance of the wider dock before that date, served a statutory notice under G.L. c. 187, § 3, or otherwise took an action so as to cut off the prescriptive period. In the May 2016 Letter, WBC objected to the Ho/O'Donnells' use of the dock, and claimed they did not own it, but made no mention of the width. Exh. 53. The dock remained in its location, openly and notoriously wider than the three foot restriction, for twenty years, beginning in July of 1996, and ending in July of 2016. I find therefore, that while the dock is in the wrong location, the Ho/O'Donnells (and their successors in title) have obtained an easement by prescription to maintain a dock of the same width as the existing one, approximately 5-6 feet. 





Conclusion 





 For the foregoing reasons, I find that (a) the Ho/O'Donnells have title by adverse possession to the 54-square foot area that the angled portion of the wall occupies in the southwestern corner of their property, (b) the Ho/O'Donnells have trespassed on the Open Space Parcel owned by WBC by the encroaching stone step, and owe nominal damages to WBC of $100.00, (c) the Ho/O'Donnells have not otherwise committed trespass to WBC's property, (d) the Ho/O'Donnells' right of way across the Open Space Parcel is limited in scope to the right of way granted in the dock easement, and therefore their dock must be moved to within the right of way, (e) the Ho/O'Donnells own the dock and have acquired an easement by prescription to maintain a dock in the same width as the existing dock attached to the southeastern corner of the Open Space Parcel, and (f) the remainder of the Counterclaim must be dismissed. 





 Judgment Accordingly. 












 Exhibit A 











FOOTNOTES
[Note 1] A view "inevitably has the effect of evidence, and information properly acquired upon a view may properly be treated as evidence in the case." Talmo v. Zoning Bd. of Appeals of Framingham, 93 Mass. App. Ct. 626 , 629 n.5 (2018) (internal citations and quotations omitted); see also Martha's Vineyard Land Bank Comm'n v. Taylor, No. 17-P-1277 (Mass. App. Ct. June 22, 2018) (Rule 1:28 decision). 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.