EASTERN RAILROAD COMPANY *vs.* AARON H. ALLEN.

Suffolk. Jan. 30, 31. — April 3, 1883. FIELD & W. ALLEN, JJ., absent.
HOLMES, J., did not sit.

At the trial of a writ of entry, brought in 1880, to recover a parcel of flats, there was evidence that the flats were originally flowed by tide water, and were in a cove, across the mouth of which, as early as 1645, a dam had been built to obtain power for running a tide-mill; that, in 1803, a corporation, authorized by its charter to operate a canal, and to hold mill-seats on waters connected with its canal, took a deed of the demanded premises; and entered its canal upon the mill-pond, and had a floating tow-path projecting into the pond, which, in 1829, was removed, and a solid tow-path was built; that, from 1829 to 1851, the pond was used for canal and mill purposes, and was flowed or emptied at convenience; that canal-boats and timber were kept in the pond by the corporation, and no person other than the corporation exercised any control over the pond; that, in 1839, the corporation executed a lease of the mill for fifteen years, with liberty to use soil from the bottom of the pond to repair the dam; that the canal was discontinued in 1851, after which the pond was used for mill purposes and to store timber; that, in 1844, the corporation conveyed the mill and pond, subject to the lease, and subject to the right of the corporation to use the pond for canal purposes and to store timber therein; that material was used at different times from the bottom of the pond to repair the dam; that access from the sea was cut off by the dam, and access from the upland was cut off by the canal and tow-path; and that the mill was abandoned in 1872. *Held,* that this evidence would warrant a finding that a title to the soil under the pond had been acquired by adverse possession.

WRIT OF ENTRY, dated December 18, 1880, to recover a parcel of flats in that part of Boston formerly Charlestown. At the trial in the Superior Court, without a jury, before *Aldrich*, J., it appeared that the flats in question were originally flowed by tide water, and that they now lay under and on the easterly side of a tide-mill pond. It was admitted that the pond was originally a cove, across the mouth of which, as early as 1645, a dam had been built.

The demandant claimed title to the land by virtue of a lost grant of the fee from the rightful proprietor, either the Colony or the town of Charlestown, to grantees whose title had become vested in the demandant; and also by virtue of an exclusive, notorious and adverse possession thereof, continued for more than twenty years, by itself and by those under whom it claimed.

The tenant, who owned the upland adjoining the pond, claimed title in fee to the land under the colonial ordinance of 1647,

contending that the ancient mill proprietors and their successors had only an easement in the land of flowage for mill purposes, and that this easement had ceased by reason of an abandonment of the mill in 1872.

The judge found, upon evidence documentary and oral, that there was an original grant in fee of the demanded premises by the rightful owners thereof, and that the title of the original grantees was vested in the demandant; and that, if the evidence did not authorize the finding of an original grant, the demandant and its grantors had acquired title to the demanded premises by adverse possession continued for more than twenty years before the date of the writ. The judge reported the case, with the evidence, for the determination of this court. The nature of the evidence, so far as it relates to the question of adverse possession, appears in the opinion.

*C. Robinson, Jr. & G. A. Blaney*, for the tenant.

*R. Olney & W. Minot, Jr.*, for the demandant.

C. ALLEN, J. The demandant contended, at the trial, that it had an absolute title in fee to the flats in controversy, by virtue of an exclusive, notorious and adverse possession thereof, continued for more than twenty years, by itself and by those under whom it claimed; and it was so found. If this finding was warranted by the evidence, the judgment must be for the demandant.

As bearing upon this question, there was a large body of evidence, which tended to show the following facts, among others : The Proprietors of the Middlesex Canal, from whom, through mesne conveyances, the demandant's title was derived, were a corporation, established primarily as a canal company, authorized by its charter to collect a toll for all masts, timber and lumber floated through its canal; and, by a subsequent amendment, it was also authorized to purchase and hold mill-seats on the waters connected with the canal, and lands to accommodate the same, and to erect mills thereon. Sts. 1793, *c.* 21, § 6 ; 1798, *c.* 16. In 1803, this corporation took a deed of a certain messuage, mills, mill-pond, dam, &c., which included the premises now in controversy. The canal entered upon the mill-pond, and, at the outset, there was a floating tow-path along the circuitous course of the canal; but, as early as 1829, the canal was

made straight between the demanded flats and the upland, and a solid tow-path was built, ten or fifteen feet broad, with piles driven both in the front and rear thereof, and the space filled in with mud and earth. From 1829 to 1851, the pond was used only for canal and mill purposes, and was flowed or emptied at convenience. Canal-boats were kept in it, and also timber which came down the canal, until sold by its owners. No one except the corporation had any control over the pond, so far as known to the witness Elliot, who had charge of this part of the canal during all that period. In 1839, the corporation executed to one Davidson a lease of the mills for fifteen years, with liberty to dig away and use, for the purpose of repairing the dams, all the marsh or island lying in the mill-pond, and the mud from the flats thereof. The use of the canal was discontinued in 1851, after which the pond was used for a time for mill purposes, and by the persons who still had timber stored therein. In 1844 the corporation conveyed the mills and mill-pond to one Lockwood, subject to the lease above referred to, with certain reservations, among which was the right to use the pond for canal purposes and as a depot for lumber, and to place and keep the same there at its own pleasure and convenience. A road thirty feet wide along the tow-path was projected in 1826, and was built at some time not stated in the testimony, and was laid out as a public street in 1868. There had originally been a point of upland or marsh, sometimes called Swan Island, which, however, was not an island till after the canal had been dug through it, lying on the westerly or pond side of the canal as it finally existed; and one of the witnesses, Brown, testified that, after the canal was straightened, that point had all been dug away, leaving no grass turf, but a slight ridge; and there was other evidence to show that material was afterwards taken from there, as well as from other places, to repair the dam. Another witness, Sampson, testified that he presumed that the water, when in the pond, was always over this piece of marsh, Swan Island.

It thus appears that the evidence tended to show that, by the erection and maintenance of the dam, not only had the power been secured to flow the premises, but the common right to pass from the sea over the flats at high water with boats and vessels

had long been cut off. The approach to the flats and pond from the adjoining upland was also effectually cut off by the canal and permanent tow-path. An actual occupation of the pond was made by storing lumber and keeping canal-boats therein. The soil was also dug up at pleasure. These uses continued undisturbed for more than twenty years. Finally, a street was laid out along the line of the tow-path.

It was contended by the tenant, that the flowing of land by a mill-owner does not amount to a disseisin of the owner of the land, and that a title obtained by occupation and use is only commensurate with such occupation and use; and, as general statements, both of these propositions are true. That is to say, a use or possession which is not adverse to the owner, or which is concurrent with that of others, or which does not exclude a similar use or possession by others, will not confer a title in fee, however long continued. But when the possession does effectually exclude that of others, it is immaterial by what acts such possession may be accompanied or manifested. If one fences in a tract of land, and asserts and maintains a right to the exclusive occupancy thereof, and keeps all others from entering thereon, it is of no consequence to his title whether he uses it for cultivation, for depasturing cattle or sheep, or merely for a hunting-ground. One method of occupation may be more satisfactory than another as evidence of exclusive possession; but there is no rule of law that a title by adverse possession can only be gained by certain particular methods of occupation. It is possible, indeed, that the doctrine that the flowing of land by a mill-owner will not amount to a disseisin of the owner of the land may require qualification as applied to tide-mills. But, however this may be, the various methods of use which have been described in the present case, when taken together, may well have been deemed to show an exclusive and adverse occupancy; especially when accompanied by evidence that in point of fact, for a long series of years, no actual use of the pond was made by others which was inconsistent with an assertion of title by the demandant's predecessors. The case is strikingly like that of *Tufts* v. *Charlestown*, 117 Mass. 401, in its legal aspects, and the principles there laid down well justify the finding of the judge.

It is therefore unnecessary to consider the interesting questions which were argued in relation to the presumption of a lost original grant. *Judgment for the demandant.*