SWEENEY vs. SWEENEY, REG 15-43498, MISC 19-000123

































 
 KENNETH W. SWEENEY, Plaintiff; MARIALAINA A. LANNIN, Plaintiff, v. KENNETH W. SWEENEY, Defendant
 REG 15-43498, MISC 19-000123 
 OCTOBER 7, 2021
PLYMOUTH, ss.
J.FOSTER
DECISION














 Introduction 





 Kenneth Sweeney and Marialaina Lannin own abutting lots that bound on Little Sandy Bottom Pond, a great pond in Pembroke. Their lots were originally laid out as part of a 100+ lot subdivision shown on a July 1915 plan. This plan, like so many plans of the era, created small cottage lots along the water, presumably for vacation use. See, e.g., Zarba v. Town of Oak Bluffs Zoning Bd. of Appeals, 27 LCR 677 (2019) (Misc. Case No. 17 MISC 000139) (Foster, J.); Denardo v. Bosworth, 20 LCR 344 (2012) (Misc. Case Nos. 06 MISC 324036, 07 MISC 346353) (Foster, J.). These plans tended not to be precisely surveyed, which may not have been a problem when the lots were inexpensive, the cottages small, and the uses seasonal. These lots have long since become quite valuable as their owners have built or improved houses for permanent residential use, however, and it has become important to determine just where the boundaries of these lots are. 





 Mr. Sweeney seeks to register the boundaries of his lot. Ms. Lannin has brought a separate claim that her lot actually extends into the area Mr. Sweeney claims is part of his lot. These claims were tried to me. As discussed below, I find that, based on both the actual location of Mr. Sweeney's lot as shown on the 1915 plan and the areas he claims by adverse possession, Mr. Sweeney has demonstrated his boundaries; Ms. Lannin, while not owning the area up to Mr. Sweeney's house as she claims, has established title by adverse possession to the portion of her property that lies within the bounds of Mr. Sweeney's lot under the 1915 plan. 





Procedural History





 Kenneth W. Sweeney (Mr. Sweeney or Petitioner) filed his Petition for Registration of property located on Woodbine Avenue in Pembroke, MA on December 28, 2015 in Registration Case No. 15 REG 43498 (Registration Case), claiming that he obtained title both by deed and by adverse possession. 





 Marialaina A. Lannin (Ms. Lannin or Respondent) filed a complaint (Complaint) for encroachment in this matter in the Plymouth Superior Court on March 6, 2017 naming as defendant Kenneth W. Sweeney (the Superior Court action). The Complaint contains a single count, alleging encroachment upon Lannin's property. After Sweeney's Motion to Dismiss was denied on June 16, 2017, Sweeney filed Defendant's Answers to Complaint and Counterclaims (Counterclaim) on July 7, 2017. The Counterclaim contains two counts: (I) Misrepresentation of Material Facts, and (II) Filing of a Complaint as retaliation and in bad faith. Ms. Lannin filed an Answer in the Registration Case on August 31, 2018. At a status conference on January 30, 2019, the Court advised that if the related Superior Court action were transferred, it would be treated as a companion case with the Registration Case. On March 7, 2019, the Superior Court Action was transferred to the Land Court pursuant to G.L. c. 211B, § 9, and the Complaint was filed with this court. 





 The Pre-Trial Conference was held on July 16, 2019. The court took a view on November 18, 2019. Trial was held on November 19, 20, and 21, 2019, and on January 7, 2020. Exhibits 1- 37, 38A, and 39-50 were marked. Testimony was heard from Kenneth Anderson, John Woods, Kenneth Sweeney, Jeffrey Bezanson, George Furness, Christopher Kelley, and Marialaina Lannin. On November 20, 2019, the second day of trial, Sweeney's Motion for Finding was denied. Both Marialaina A. Lannin's Post Trial Brief and Petitioner Kenneth W. Sweeney's Post Trial Brief were filed on June 19, 2020. The court held a Post Trial Hearing and heard closing arguments on June 26, 2020 by video conference and took the case under advisement. This Decision follows. 





Facts 





 Based on the view [Note 1], the undisputed facts, the exhibits, the testimony at trial, and my assessment of credibility, I make the following findings of fact: 





 1. Mr. Sweeney is the owner of and resides at the land known as and located at 62 Woodbine Avenue, Pembroke, MA 02359 (Sweeney Property). Exh. 1. 





 2. Ms. Lannin is the owner of and resides at the land known as and located at 58 Woodbine Avenue, Pembroke, MA 02359 (Lannin Property). Exh. 1. 





 3. 62 Woodbine Avenue and 58 Woodbine Avenue are abutting and contiguous properties that share a common bound (being the north property line of 58 Woodbine Avenue and the South property line of 62 Woodbine Avenue) extending generally westerly from Woodbine Avenue to Little Sandy Bottom Pond. Exh. 1; View. 





 4. Little Sandy Bottom Pond is a Great Pond and is sometimes identified as Little Sandy Lake and Little Sandy Pond. Exh. 1. 





 5. The rights of the public in and to Little Sandy Bottom Pond are to remain without impact from this registration case. Exh. 1. 





 6. The northerly abutter to the Sweeney Property, Rosarie M. Tanguay, did not appear or file any opposition in the Registration Case. Exh. 1. 





 7. Sweeney purchased the Sweeney Property from Jeffrey C. Bezanson (Mr. Bezanson) by a deed dated June 30, 2004 and recorded with the Plymouth County Registry of Deeds (registry) at Book 28574, Page 238 (Sweeney Deed). Exh. 24. 





 8. The Sweeney Deed, as well as all of the deeds in Mr. Sweeney's chain of title put into evidence, convey Lot 12A as shown on a plan entitled "Plan of House Lots at Woodbine, Little Sandy Pond," Dana M. Pratt, C.E., recorded with the registry at Plan Book 2, Page 871, dated July 1, 1915 (Pratt Plan). [Note 2] A copy of the Pratt Plan is attached as Exhibit A. Exh. 7, Exh. 24, Exhs. 25-34, Tr. I-126, I-128. 





 9. Like the other deeds in Sweeney's chain of title, the Sweeney Deed describes Lot 12A, generally, as being bounded by Lot 11A to the northeast as shown on the Pratt Plan, southeasterly by "Lake Avenue [...] 40 feet more or less," southwesterly by Lot 13A as shown on the Pratt Plan, and northwesterly "by Little Sandy Pond [...] 40 feet more or less." The Pratt Plan shows Lot 12A as having 40 feet of frontage along Lake Avenue but does not state the lengths of any of the other boundaries. Exh. 7, Exh. 24, Tr. I-128-129. 





 10. Lannin purchased the Lannin Property from Michael J. Corey, Individually and as Trustee of Corey Realty Trust, by a deed dated October 28, 1994, and recorded with the registry at Book 13235, Page 260 (Lannin Deed). The Lannin Property, as described in the Lannin Deed, is comprised of 2 lots, the northerly being described as Lot 13A on the Pratt Plan, bounded northeasterly by Lot 12A. Lot 13A, as shown on the Pratt Plan and as described in the Lannin Deed, has 37 feet of frontage along Lake Avenue. Exh. 7, Exh. 17, Tr. II-169-170. 





 11. What is shown as Lake Avenue on the Pratt Plan was subsequently renamed and is now known as Woodbine Avenue. Exh. 7, Tr. II-120. 





 12. Both surveyors who testified, Kenneth B. Anderson and Christopher Kelley, agreed that the Pratt Plan has significant flaws. While it lays out over 100 lots, the Pratt Plan only establishes one monument on the entire plan, on the northeast corner of Lot 32 on that plan. While it does show frontages of lots, a note below the title states "areas and distances approximate." Mr. Anderson testified that West Street as laid out by the county is not in the same location as shown on the Pratt Plan, because the monument is now significantly beyond West Street. The Pratt Plan shows no compass angles, though the rectangular lots are, impliedly, rectangular. I credit this testimony and find that the Pratt Plan is significantly flawed. Exh. 7, Exh. 11, Tr. I-33-34, I-36, I-38-39, II-217-218, View. 





 13. In 1983, Ruth Emery, owner of Lot 11A (the Sweeney Property's northerly abutter) as shown on the Pratt Plan, had a survey completed of her property by one Carleton W. Garvey (Garvey Plan), recorded with the registry at Plan Book 24, Page 257. The following note (with omissions for brevity) is found on that plan: 





 NOTE: THIS PLAN SHOWS WHAT IS THIS OFFICE'S INTERPRETATION OF THE LOCATION OF WHERE LOT 11A AND LOT 76 WERE INTENDED TO BE LAID OUT BY D.M. PRATT C.E. [...] FROM A SURVEY OF THE ENTIRE SUBDIVISION AND THE LOCATION OF MANY PIECES OF MONUMENTATION, INCLUDING THE ONLY BOUND SHOWN ON THE ORIGINAL SUBDIVISION PLAN, THIS OFFICE FEELS IT HAS RE-ESTABLISHED THE ABOVE MENTIONED NORTHERLY AND WESTERLY PROPERTY LINES. FROM A FIELD SURVEY THIS OFFICE FINDS LOT FRONTAGES ON WEST STREET AND ACTUAL FIELD MONOMENTATION TO DISAGREE BY 26 +- FT. [...] IT APPEARS THAT THE SOUTHERLY PROPERTY LINE OF THE SUBDIVISION PLAN IS IN ERROR. FROM FIELD MONUMENTATION FOUND IT APPEARS LOTS HAVE BEEN LAID OUT FROM THE SOUTHERLY PROPERTY LINE CREATING AN OVERLAP IN THE SUBDIVISION. IN CONCLUSION THIS PLAN IS INTENDED TO SHOW THE LOCATION OF LOTS 11A AND 76 AND IS NOT A FINAL SOLUTION TO THE MANY ERRORS FOUND IN THE D.M. PRATT C.E. SUBDIVISION PLAN. 





 Exh. 9. 





 14. The Garvey Plan shows a number of monuments, iron pipes and drill holes, at the borders of the Lannin and Sweeney Properties, which are not shown on the Pratt Plan. A copy of the Garvey Plan is appended as Exhibit B. Exh. 7, Exh. 9, Tr. II-214-216, Tr. III-8-9. 





 15. On June 2, 1988, Carleton Garvey prepared a plot plan for Jeffrey Bezanson, which appears to be based upon the Garvey Plan, in that it shows the same monuments and distances as the Garvey Plan. However, none of the monumentation in the plot plan, such as the iron pipes along Little Sandy Bottom Pond, is recited in the deed to Mr. Bezanson, which references only the Pratt Plan. Therefore, I do not credit the Garvey plot plan. Exh. 14, Exh. 25, Tr. III-29, III-30-31. 





 16. Mr. Anderson was hired by Mr. Sweeney to conduct a survey for his registration petition, which he produced on August 6, 2015, and revised on December 8, 2015; the relevant version of Mr. Anderson's survey is marked as Exhibit 2B (Anderson Survey). The boundaries that Mr. Sweeney is claiming in his registration case are shown in green on the Anderson Survey. Mr. Anderson located those green lines based upon Mr. Sweeney's occupation on the ground. A copy of the Anderson Survey is appended as Exhibit C. Exh. 2A, Exh. 2B, Tr. I-49-50, I-99, I 101, View. 





 17. The area of land that Mr. Sweeney is claiming in the registration case, shown in green, begins at a point in the southeasterly corner between the fence posts of the two chain-link fences separating Ms. Lannin's front yard from Mr. Sweeney's, running westerly along the fence line and beyond in a straight line to an iron pipe located along the shoreline of Little Sandy Bottom Pond, then turning north to another iron pipe found in a retaining wall along the pond, then along a line northwesterly to the lot corner along the same line shown on the Garvey Plan, and beyond to match a fence line along Woodbine Avenue, then running south in a straight line, meeting up with a fence in the front of Mr. Sweeney's yard along Woodbine Avenue to the point of beginning. The frontage on Woodbine Avenue claimed in Mr. Sweeney's registration petition and shown on the Anderson Survey is 48.04 feet. Tr. I-58, 1-60-61, I-152, Exh. 2B. 





 18. Mr. Sweeney is not seeking a determination regarding the location of the boundary of Little Sandy Bottom Pond, a Great Pond pursuant to G.L. c. 91, § 35, or the length of the side lot lines as they extend into Little Sandy Bottom Pond. Mr. Sweeney recognizes, as he must, that the submerged lands and the water of Little Sandy Bottom Pond are owned by the Commonwealth of Massachusetts and are subject to the rights and interests of the public. Exh. 13. 





 19. The Anderson Survey also shows a set of orange lines, which reflect Mr. Anderson's attempt to reproduce the Pratt Plan on the ground. He did so by locating the one monument shown on the Pratt Plan (in a prior survey conducted in 2010, which was filed as Exhibit 11 in this case) and placing the survey on the ground from there. Because many of the distances on the Pratt Plan are missing, Mr. Anderson used scaling, the width of the streets, the lot area sizes given, and the frontages to reproduce the survey. Mr. Kelley, expert witness for Ms. Lannin, did not have any reason to believe that Mr. Anderson's attempt to place the Pratt Plan on the ground was inaccurate. The Garvey Plan, on which Mr. Kelley relied, locates the Pratt Plan lot lines remarkably close to where Mr. Anderson locates them (with the exception of the boundary between Lot 12A and Lot 11A.) I credit Mr. Anderson's work, and find that the orange lines on the Anderson Survey accurately reflect where Lot 12A as shown on the Pratt Plan lies. 

Exh. 2A, Exh. 2B, Exh. 7, Exh. 11, Tr. I-30, I-33, I-37, I-50, I-109, I-114, III-11-12, III-14-15, III-25-26. 





 20. The blue lines shown on the Anderson Survey are the lot lines as defined in the Garvey Plan. The southerly bound of Lot 11A on the Garvey Plan is the same line that Sweeney claims in his registration case to be his northern boundary, just extending further into Woodbine Avenue by 7.78 feet. Exh. 2B, Exh. 9, Tr. I-40-41, I-40. 





 21. In 2014, Ms. Lannin hired Mr. Kelley to conduct a survey of her property so that she could replace her fence. Mr. Kelley, in conducting his survey, did not review Mr. Sweeney's chain of title or his deed description. Nor does his survey match up with the deed description in Ms. Lannin's chain of title. Instead, Mr. Kelley relied upon the Garvey Plan, including the monuments and geometry shown on that plan, and the deed frontages in conducting his survey. Based upon his testimony, and lack of explanation for his crediting of the Garvey Plan, I do not credit Mr. Kelley's survey. Exh. 7, Exh. 9, Exh. 16, Tr. II-214-217, Tr. II-227, Tr. III-8, Tr. IV 29. 





 22. The Pratt Plan's Lot 12A, as shown by the orange lines on the Anderson Survey, begins at a point in the middle of Mr. Sweeney's driveway approximately 7 feet south of Sweeney's claimed northerly line, runs south 40 feet past the fences between the Sweeney Property and Lannin Property, then runs westerly roughly 74 feet through the iron pipe in the southwesterly corner of Sweeney's property and ending significantly beyond the shoreline of Little Sandy Bottom Pond, northerly again an undetermined number of feet to another point within Little Sandy Bottom Pond, then westerly back to the point of origin in a line parallel to the southerly line. The northerly line of the Pratt Plan's Lot 12A passes through the home lying on Lot 11A, Mr. Sweeney's northerly abutter. Exh. 2B, Tr. I-56, I-87. 





 23. Jeffrey Bezanson, Mr. Sweeney's predecessor-in-title, owned the Sweeney Property from 1976 to 2004, or a period of 28 years. He did not reside at the Sweeney Property, but rented it to tenants. As is his custom with every property he rents, he would visit the property monthly to collect the rent payments. During his ownership of the Sweeney Property, Mr. Bezanson would visit "every weekend or most every weekend" to sail on Little Sandy Bottom Pond on a boat that he kept underneath the house on the Sweeney Property. He would also visit the home between tenants to check on the property. I credit his testimony. Tr. II-65-66, II-67-68; View.





 24. During Mr. Bezanson's ownership of the Sweeney Property, he testified that there was a chain link fence along the southern side of the property, along the green line shown on the Anderson Survey, running from the street to a point south of the front corner of his house, but not running any further than that towards the pond. I credit his testimony. Tr. II-69, Exh. 2B. 





 25. Mr. Bezanson testified that during his ownership, he and/or his tenants used the land within the green lines in front of the house on the Sweeney Property, from the fence line on the south to the fence on the north line on the other side of the driveway. I credit his testimony. Tr. II-71, Exh. 2B. 





 26. Mr. Bezanson testified that no one ever told him of a boundary dispute concerning the Sweeney Property while he was the owner, nor did his tenants ever tell him of such a dispute or claim to his front lawn. I credit his testimony. Tr. II-71, II-72. 





 27. During his ownership of the Sweeney Property, Mr. Bezanson testified that he had work done on the septic system twice: an upgrade and a replacement. The upgrade, completed in 1978, was to install a leaching bed. The replacement was done in 1985 by A.E. Wood Excavation Company. For the replacement, the old system had to be dug out. As shown on the Board of Health Application to replace the septic system, the septic was installed in an area directly in front of the house on the Sweeney Property, and, according to Mr. Bezanson (who saw the pit that was dug), was not installed beyond the fences between the Sweeney and Lannin Properties. I credit his testimony and find that the septic system was installed directly in front of the house on the Sweeney Property, and about 3.5 feet southerly of the southeastern corner of the house, as shown on the Anderson Survey. Tr. II-74, II-76, II-78-79, II-82, II-85, II-87, II-91, II 92-3, II-94, II-95-96, II-97, II-101, Exh. 42, Exh. 39, Exh. 2B.





 28. Mr. Bezanson testified that shortly after replacing the septic system, around 1985, he installed a fence along the front of the Sweeney Property, along the street line, from the corner where the two fences between the Lannin and Sweeney Properties end at the street, north to the driveway. This had the effect of closing in the front yard of the Sweeney Property on two sides. That fence was still in place when he sold the property to Mr. Sweeney. Mr. Bezanson testified that Ms. Lannin, after she bought the abutting property in 1994, never told him, or any of his tenants, to remove any of his fencing. I credit his testimony. Tr. II-107-111, Exh. 2B. 





 29. Mr. Bezanson testified that as of 1985 his driveway was unpaved, consisting of dirt and gravel. Because the driveway was raised (along with the whole front yard) when the septic was installed, there were railroad ties placed at the top of the driveway, just off the house. I credit his testimony. Tr. II-113-114. 





 30. Mr. Sweeney identified his driveway as encompassing the area so depicted on the Anderson Survey. It is currently blacktop or asphalt, but it was dirt and stone when he purchased the Sweeney Property. He had it paved sometime after 2004, likely in the summer of 2005. When he had it paved, the driveway remained in the same place as it had always been. Indeed, the railroad ties that Mr. Bezanson referenced in his testimony are in the same location today, according to Mr. Sweeney, at the top of his driveway. The railroad ties run from the corner of his house, and touch railroad ties that bound his northerly neighbor's land. I credit Mr. Sweeney's testimony, and find that the driveway has existed in the same location since he purchased the property. Tr. II-13-15, II-16, Exh. 2B; View. 





 31. While Mr. Sweeney purchased the Sweeney Property in 2004, he originally moved into the home on the property in June of 2003 as a tenant of Mr. Bezanson, and has lived there ever since. Tr. I-160-161.





 32. Mr. Sweeney testified that since 2003 he "used" the land he knows as his front lawn from the fence between his and Ms. Lannin's yard, to the other side of his driveway, and up to the street line. He also testified that he "uses" and "occupies" all the land within the green lines as shown on the Anderson Survey. Mr. Sweeney uses the area up to the wooden fence on the northern bound of his property as shown on the Anderson Survey, to park his truck. He uses the area behind his home between the two iron pipes, and the area south of his house to a straight line running from the iron pipe to the chain link fences. He has maintained and mowed the front lawn, and raked the leaves, and shoveled his driveway. He has mowed the backyard and raked the beach. He uses the "side yard" between his house and Ms. Lannin's house to access the pond. It was always his understanding from the time that he moved in that the area within the green lines on the Anderson Survey was his property. I credit this testimony. Tr. I-161, I-162-164, I 181, I-182-184, I-185-186, I-187, II-28, II-46, Exh. 2B; View. 





 33. Before he moved in, and until he purchased the home, Mr. Sweeney testified he did not have any conversations with Mr. Bezanson about a boundary line dispute with Ms. Lannin. I credit this testimony. Tr. I-161, I-172. 





 34. Mr. Sweeney testified that he installed his chain-link fencing in 2004, as shown on the Anderson Survey as a line marked with "x"s. It encompasses the front "yard" of the Sweeney Property, in front of the house, excluding the driveway, and has a gate to his side yard off the southeasterly corner of his house, connecting to the fence running between the Lannin Property and Sweeney Property. To install it, Mr. Sweeney removed the existing fence along Woodbine Avenue installed by Mr. Bezanson, and replaced it with a higher fence, but in the same location. Mr. Sweeney installed the fence to keep his dogs fenced in and protected from cars. I credit this testimony. Tr. I-165-166, I-167-168, Exh. 2B; Exh. 43, Exh. 44, Exhs. 46-50, View. 





 35. As part of installing new fencing in 2004, Mr. Sweeney testified that he put in a new, taller fence along the old fence that existed between his yard and Ms. Lannin's yard, not touching the old fence, but running along it. Like the old fence that is still there on the Lannin or southerly side, it runs west only to the front of his house. There is no fence between the Sweeney and Lannin Properties westerly of the front of the houses, i.e., from the front of the houses to the pond, nor has there been a fence there since Mr. Sweeney has lived there. I credit this testimony. Tr. I-166-167, Tr. II-45-46, Exh. 2B, Exh. 43, Exh. 44, Exhs. 46-50, View. 





 36. Sometime after installing the fence, either in 2005 or 2006, Mr. Sweeney planted five arborvitaes along the fence between his yard and Ms. Lannin's yard. Tr. II-47-48, Exh. 46, Exh. 50, View. 





 37. Mr. Sweeney testified that he did not put the fence in himself in 2004, but hired a contractor to do it for him. To his recollection, he never had any conversation with Ms. Lannin regarding the fence, nor did his contractor, at the time of its installation or after. He disputes Ms. Lannin's account of a conversation at the time the fence was being installed, and contends that it never occurred. Tr. I-168, I-169-171, I-172, I-176-177, II-32-34. 





 38. Mr. Sweeney does not recall having any conversations with Ms. Lannin related to the boundary line while he was a tenant from 2003 to 2004, or around the time he purchased the property. Tr. I-171-173. 





 39. According to Mr. Sweeney, the first time he learned there was a dispute as to the boundary line was when he saw Mr. Kelley, the surveyor, in his front yard, doing work for Ms. Lannin, in 2014 or 2015. About a year later, Ms. Lannin approached Mr. Sweeney and asked him to sign an easement. Tr. I-177-179. 





 40. Ms. Lannin testified that since she moved into the Lannin Property in 1994, the old chain link fence to the north of her property, between her yard and Mr. Sweeney's yard, has never moved. She has always maintained it, understanding it to be hers. I credit this testimony. Tr. IV-13-14; Exh. 43, Exh. 48, View. 





 41. Beginning when she moved in in 1994, Ms. Lannin testified that she has accessed the north side of the old chain-link fence, just north of her house, periodically. She would do so to play with her neighbor's dog. I credit this testimony. Tr. IV-15. 





 42. Since 1994, Ms. Lannin testified she would access the space between the houses, where there is no fence, to go down to the beach on Little Sandy Bottom Pond, to access her dryer vent, to clean her pellet stove pipe, clean a greenhouse window, and clean her vinyl siding. At one time she asked tenants of the Sweeney Property to remove chairs and coolers from that area so she could access the pond, but it "was nothing constant." I credit this testimony. Tr. IV 15, IV-17, IV-19, IV-20, Exh. 46. 





 43. It was never Ms. Lannin's understanding, since she purchased her property, that the fence between her yard and Mr. Sweeney's was the boundary line between their properties. No one, until Mr. Sweeney moved in, restricted her use of the area beyond the fence, or between the two houses. Ms. Lannin testified that after Mr. Sweeney moved in, there was a time her carpenters were instructed to keep their materials up close to her house. Tr. IV-17, IV-19, IV-20- 21. 





 44. Ms. Lannin testified that she observed Mr. Sweeney's fence installer digging a hole on day, and she inquired about it. She discussed his plan to put in a fence along her old chain-link fence between the two yards and asked about the boundary line. She objected to its placement. She said she allowed him to fence in the front for the safety of his dogs, "to keep the peace." She testified that she wanted to get a survey done, and then move the fence accordingly. She refused to let him erect a fence beyond the front of their houses, because she believed from his mortgage plan that she owned the property between them. I credit Ms. Lannin's memory of this conversation. Tr. IV-22-24. Tr. IV-25, Tr. IV-27. 





 45. In 2016, Mr. Sweeney placed a padlock on the gate to his yard, preventing access by Ms. Lannin and her surveyor. Tr. IV-28, Exh. 41. 





 46. George Furness lived across the street from the Lannin and Sweeney Properties from 1949 to 1971 (from age 6 until he married, with the exception of his time in the service from 1963 to 1966) and visited his mother at her house there weekly until 2011. As a child, he used to go fishing along the shore of Little Sandy Bottom Pond. He testified that the fence between the Sweeney and Lannin Properties has been there as long as he can remember. In fact, it used to run the entire length between the properties, in a straight line down to the iron pipe on the southwesterly corner of Mr. Sweeney's beach, which used to anchor the fence. He does not know when the section between the two houses was removed. The fence's location never moved. Mr. Furness testified that people in the neighborhood would access the pond from the northerly side of that fence but wouldn't have been able to do so between the fence and Ms. Lannin's house, because it was too narrow a gap. Mr. Furness didn't testify to any public use of the Sweeney Property for access (without his permission) after the mid to late 1950s. I credit his testimony. Tr. II-134-136, II-137-140, II-141-142, II-146-147, II-151, II-152, II-153-155.





Discussion 





 The issue tried to me in these two casesMr. Sweeney's registration case and Ms. Lannin's miscellaneous caseis the location of the boundaries of the Sweeney Property, especially the boundary between the Sweeney and Lannin Properties. "The location of a disputed boundary line is a question of fact to be determined 'on all the evidence, including the various surveys and plans, and the actual occupation and use[s] by the parties.'" Ellis v. Ashwood Realty, LLC, 19 LCR 520 , 523 (2011) (Misc. Case No. 08 MISC 371325) (Piper, J.), quoting Hurlbut Rogers Mach. Co. v. Boston & Me. R.R., 235 Mass. 402 , 403 (1920). "When presented with expert surveying and title testimony, a court must assess the opinions offered. The court must decide which . . . expert it finds more credible, basing such assessment on the experts' analyses, taking into account the other evidence presented, including the documentary evidence, particularly the deeds and plans that lend support and corroboration to each opinion." Lombard v. Cook, 20 LCR 325 , 326 (2012) (Misc. Case No. 07 MISC 346981) (Scheier, J.). 





 I. Record Title 





 The Sweeney Deed, and all of the deeds in Mr. Sweeney's chain of title entered into evidence, convey what is now known as 62 Woodbine Avenue by reference to Lot 12A as shown on the Pratt Plan. Exhs. 24-34. Therefore, for the purposes of trial, the court accepts that Mr. Sweeney has record title by virtue of his deed to that area shown as Lot 12A on the Pratt Plan. [Note 3] "A plan referred to in a deed becomes part of the contract so far as may be necessary to aid in the identification of the lots and to determine the rights intended to be conveyed." Reagan v. Brissey, 446 Mass. 452 , 458 (2006), quoting LaBounty v. Vickers, 352 Mass. 337 , 339 (1967). The next question, therefore, is: "where is Lot 12A?" 





 The Anderson Survey locates the Pratt Plan, shown with orange lines, with reference to the one monument on the entire Pratt Plan, by using the dimensions given on the Pratt Plan together with the geometry. Tr. I-30, I-33, I-109, I-114, Exh. 2A, Exh. 2B, Exh. 7. In interpreting deed descriptions, the hierarchy of priorities is that "[d]escriptions that refer to monuments control over those that use courses and distances; descriptions that refer to courses and distances control over those that use area; and descriptions by area seldom are a controlling factor." Paull v. Kelly, 62 Mass. App. Ct. 673 , 680 (2004). Mr. Anderson followed those priorities: he identified the plan referred to in Mr. Sweeney's chain of title, located the one monument, then used courses and distances given, then lot areas and geometry. His results were remarkably similar to Mr. Garvey's (shown in blue on Exh. 2A and 2B), with the notable exception of the southern boundary line of Lot 11A, or Mr. Sweeney's northern boundary. I find, therefore, that Mr. Anderson located, as accurately as possible, where Lot 12A lies on the ground, shown in orange on the Anderson Survey. Exh. 2A, Exh. 2B. That orange line is the boundary of Mr. Sweeney's lot by his record title. 





 Mr. Sweeney does not seek to register the land encompassed by the bounds of Lot 12A as shown on the Pratt Plan. Rather, he seeks to register an area of land he purportedly occupies that partially overlaps with Lot 12A, but omits some portions of Lot 12A to the northwest and south and extends beyond it to the north and east, all as shown in green on the Anderson Survey. After weighing all of the evidence, I find that, once he has established his record chain of title, see note 2 supra, Mr. Sweeney may register that area of land outlined in green on the Anderson Survey, as he has established record title to the portion of his claimed lot lying within Lot 12A and has established title by adverse possession to the area extending beyond Lot 12A.





 The "leftovers" of Lot 12A, or that area of Lot 12A that extends beyond the area Mr. Sweeney seeks to register, may not simply be abandoned. The area to the west, extending into Little Sandy Bottom Pond, belongs to the Commonwealth of Massachusetts. The area to the south, extending toward Ms. Lannin's home, has been adversely possessed by Ms. Lannin. Finally, the area to the north and west, apparently occupied by Mr. Sweeney's northerly abutter who was not a party to this litigation, was unadjudicated at the trial. I will address the findings in turn. 





 II. Adverse Possession 





 "Title by adverse possession can be acquired only by proof of nonpermissive use which is actual, open, notorious, exclusive and adverse for twenty years." Kendall v. Selvaggio, 413 Mass. 619 , 621-622, (1922), quoting Ryan v. Stavros, 348 Mass. 251 , 262 (1964); G. L. c. 260, § 21. The twenty-year period can be achieved by tacking the adverse possession of a predecessor if there is privity of estate between the plaintiff and the predecessor. G.L. c. 260, § 22. The person claiming title has the burden of proving adverse possession, and this burden "extends to all of the necessary elements of such possession." Mendonca v. Cities Serv. Oil Co. of Pennsylvania, 354 Mass. 323 , 326 (1968) quoting Holmes v. Johnson, 324 Mass. 450 , 453 (1949); Lawrence v. Town of Concord, 439 Mass. 416 , 421 (2003). 





 A. Sweeney's claimed western boundary 





 On September 10, 2018, Mr. Sweeney entered into a stipulation with the Commonwealth of Massachusetts, by and through its Department of Environmental Protection and the Department of Revenue. Exh. 13. By that stipulation, Mr. Sweeney recognized that the submerged lands and water of Little Sandy Bottom Pond belong to the Commonwealth of Massachusetts. Therefore, that area of Lot 12A, as shown on the Pratt Plan, and as overlayed onto the Anderson Survey, which lies beyond the shore of Little Sandy Bottom Pond, belongs to the Commonwealth of Massachusetts. Mr. Sweeney's western boundary line is therefore along the western line highlighted in green on the Anderson Survey. Exh. 2B. 





 B. Sweeney's claimed southern boundary 





 By record title, Mr. Sweeney holds title to the area south of his house and south of the old chain link fence that separates Ms. Lannin's yard from Mr. Sweeney's yard; that is, to the southern bound of Lot 12A as shown on the Pratt Plan and established by the Anderson Survey. Mr. Sweeney seeks to register only the area to which he has record title that lies between his house and the old chain link fence. Ms. Lannin claims title to the entire area between Mr. Sweeney's house and the southern line of the Pratt Plan. As title to that entire area is held by Mr. Sweeney, Ms. Lannin can only obtain title by adverse possession. As discussed below in more detail, I find that Ms. Lannin has obtained that area south of the green southern boundary as shown on the Anderson Survey and within Lot 12A as shown on the Pratt Plan by adverse possession, but has not obtained title by adverse possession to the area north of the green southern boundary as shown on the Anderson Survey. 





 a. Continuous Use 





 Ms. Lannin continuously used the area south of the chain-link fence and extending to the area beyond the fence between her house and Mr. Sweeney's, since she moved into the Lannin Property in 1994. Since she purchased her property, Ms. Lannin believed the area up to the chain-link fence, and even beyond it, to be hers. Tr. IV-17. During her ownership from 1994, Ms. Lannin would use the space between the houses to access the beach on Little Sandy Bottom Pond, to maintain her dryer vent and pellet stove pipe, clean her greenhouse window, and clean her vinyl siding. Tr. IV-15, IV-17. Her use of the space up to where the old fence used to run has been unobstructed since 1994. Tr. IV-17. Therefore, Ms. Lannin's use of that space has, as of 2014, been continuous for at least 20 years. 





 On the other hand, I find that Ms. Lannin's use of the area north of the chain link fence, and that line, was too sporadic to be considered "continuous." She testified that she would access the area north of the fence only periodically, to play with her neighbor's dog. Tr. IV-15. This is insufficiently continuous for the purposes of adverse possession, and so I find that Ms. Lannin has not shown she used the area north of the old fence line continuously for at least 20 years. 





 b. Open and Notorious Use 





 "The purpose of the requirement of 'open and notorious' use is to place the true owner 'on notice of the hostile activity of the possession so that he, the owner, may have an opportunity to take steps to vindicate his rights by legal action." Lawrence, 439 Mass. at 421, quoting Ottavia v. Savarese, 338 Mass. 330 , 333 (1959). Explicit notice of adverse use is not required. Lawrence, 439 Mass. at 421; Ottavia, 338 Mass. at 334 ("Where the user has acted, without license or permission of the true owner, in a manner inconsistent with the true owner's rights, the acts alone . . . may be sufficient to put the true owner on notice of the nonpermissive use."); Poignard v. Smith, 23 Mass. 172 , 178 (1828) (where true owners were both out of the state, adverse possession was still found because "acts of notoriety, such as building a fence round the land or erecting buildings upon it, are notice to all the world"). "Open and notorious use of a property is thus deemed to place the true owner on constructive notice of such use, and it is immaterial whether the true owner actually learns of that use or not." Lawrence, 439 Mass. at 422. For use to be open, "the use must be without attempted concealment;" to be notorious, "it must be sufficiently pronounced so as to be made known, directly or indirectly, to the landowner if he or she maintained a reasonable degree of supervision over the property." Boothroyd v. Bogartz, 68 Mass. App. Ct. 40 , 44 (2007). 





 Here, Ms. Lannin's use of the area south of the old chain-link fence and between the two houses was open and notorious. Since she moved in in 1994, the old chain-link fence in the front yards has been in place and maintained by Ms. Lannin. Tr. IV-13. Ms. Lannin's use was sufficient to place the true owners, Mr. Sweeney and Mr. Bezanson before him, on notice of the non-permissive use: maintaining her vents, pipe, and greenhouse, and cleaning her vinyl siding, as well as accessing the pond. Tr. IV-15, IV-17. Indeed, on at least one occasion, she asked the tenants of the Sweeney Property, during Mr. Bezanson's ownership, to remove chairs and coolers from the space between the houses so that she could access the pond. Tr. IV-19, IV-20. There is no evidence that she attempted to conceal her use, and I find that her use was "sufficiently pronounced" that Mr. Bezanson or Mr. Sweeney would have known of her use if they maintained "a reasonable degree of supervision" over that sliver of property for the statutory period from 1994 until at least 2014. Boothroyd, 68 Mass. App. Ct. at 44. 





 However, Ms. Lannin's use of the area north of the chain link fence was not open and notorious. While her testimony indicated that her use in maintaining her home and accessing the pond may have crossed north of the green line west of the fence, that is, where there is no fence between the two properties, she did not testify to such use directly north of the fence itself. After Mr. Sweeney enclosed the front yard in 2004, there is no evidence that she used the area within his new fence at all. Therefore, I find that Ms. Lannin's open and notorious use extended, at most, up to a line between the two houses along where the old chain-link fence was located, but not north of the old chain-link fence.





 c. Exclusivity 





 "A claimant's use is 'exclusive' for purposes of establishing title by adverse possession if such use excludes not only the record owner but 'all third persons to the extent that the owner would have excluded them.'" Brandao v. Docanto, 80 Mass. App. Ct. 151 , 158 quoting Peck v. Bigelow, 34 Mass. App. Ct. 551 , 557 (1993). To demonstrate exclusivity, "[s]uch use must encompass a 'disseisin' of the record owner." Peck, 34 Mass. App. Ct. at 557. "That is to say, a use or possession which is not adverse to the owner, or which is concurrent with that of others, or which does not exclude a similar use or possession by others, will not confer a title in fee, however long continued." Eastern R. Co. v. Allen, 135 Mass. 13 , 16 (1883). "Acts of enclosure or cultivation are evidence of exclusive possession." LaBounty, 352 Mass. at 349. 





 Here, Ms. Lannin used the space south of the old chain link fence, and south of where that fence used to lie (according to Mr. Furness) exclusively. By maintaining the remaining portion of the old chain-link fence, which separated her front yard from Mr. Sweeney's, Ms. Lannin effectively "enclosed" that portion of her yard, evidencing exclusive possession. LaBounty, 352 Mass. at 349. There is no evidence that her use of the area south of the green line shown on the Anderson Survey was concurrent with that of others. While she may have used the whole space between the two houses, at least intermittently, for maintaining her home and accessing Little Sandy Bottom Pond, her use was exclusive only below the line where the chain link fence used to lie, as shown by the southern green line on the Anderson Survey. North of that line, Mr. Sweeney also used that area from the time he moved in in 2003. Tr. II-162-164. Therefore, Ms. Lannin's use was only exclusive south of the green lines shown on the Anderson Survey, and not to the north of that line, for the statutory period of 20 years, from 1994 to at least 2014.





 d. Adverse/Non-permissive Use 





 The essence of adverse possession is that the possessor's use of the land must be adverse or hostile to the true owner, meaning that the use is without permission of the owner. Totman v. Malloy, 431 Mass. 143 , 145 (2000). "The essence of nonpermissive use is lack of consent from the true owner." Id.; Ottavia, 338 Mass. at 333-334. Accordingly, if the true owner gives permission to use his land, there can be no adverse possession. Kendall, 413 Mass. at 623. "One's use of another person's property is adverse to that person if the manner of his use and the circumstances thereof demonstrate that he does not recognize or consider himself to be subject to an authority in that person to prevent his use of the property." Bills v. Nunno, 4 Mass. App. Ct. 279 , 284 (1976). "It is well established in Massachusetts that permissive use based on a mutual mistake as to the location of a boundary line will not defeat a claim of adverse possession." Kendall, 413 Mass. at 622. The possessor's subjective state of mind or intent is irrelevant to a claim of adverse possession. Id. at 623. One can obtain title by adverse possession even if he or she does not intend to deprive another of property. Flynn v. Korsack, 343 Mass. 15 , 19 (1961); Van Allen v. Sweet, 239 Mass. 571 , 574-575 (1921). Thus, even if the possessor believes his use is permissive because of a mistake as to titles or the location of a boundary line with adjoining land, his claim is not defeated so long as the nature of the use and resulting occupancy of the land is sufficient to indicate adversity. Kendall, 413 Mass. at 622-623; Boutin v. Perreault, 343 Mass. 329 , 331-332 (1961). 





 Ms. Lannin's use of the area south of the green line shown on the Anderson Survey was adverse and non-permissive since she moved in in 1994. From her testimony, it is evident that she believed she owned that area, and behaved as such. Not only did she maintain her home from that space between the houses, and maintain the old chain-link fence since she moved in in 1994, but she also felt empowered to ask Mr. Bezanson's tenants to remove their belongings from that space so that she could use it to access Little Sandy Bottom Pond. Tr. IV-15, IV-17, IV-19, IV 20. In the record before me, there is one instance where Ms. Lannin's use of the space between the two houses was limited, when Mr. Sweeney asked her contractors putting up vinyl siding along her house not to put it on his side of the fence. Tr. IV-20-21. But as to the southern side of the green line between the two properties on the Anderson Survey, there is no evidence that Ms. Lannin's use of the space was anything but adverse and non-permissive for at least 20 years, from when Ms. Lannin moved in in 1994 until after 2014. 





 From the testimony at trial, it seemed Ms. Lannin's use north of the green line was adverse and non-permissive as well. There is no evidence she sought or received permission in order to use the area north of the green line shown on the Anderson Survey. She used that area, instead, under the impression that she had the right to do so. Tr. IV-17, IV-19, IV-20-21. After Mr. Sweeney installed the new fence in 2004, enclosing his yard with a gate, however, there is little evidence she used any area within his fence at all. So while Ms. Lannin may have used the entire area between the two houses themselves, where no fences exist, adversely and without permission for 20 years after she moved in in 1994, her use of the area north of the old fence would have ended in 2004. 





 I find, based on the evidence, that Ms. Lannin occupied and used the area within Lot 12A (as overlayed on the Anderson Survey) but south of the old chain link fence line adversely, openly, notoriously, exclusively, and continuously between 1994 up until the time of trial, a period of more than twenty years. Twenty years from 1994 is 2014. Thus, Ms. Lannin has established title by adverse possession to this area south of Mr. Sweeney's claimed registration area, title that ripened in 2014. 





 North of the green line, Ms. Lannin's use of the land between the two houses and of the front yard was not continuous, exclusive, or open and notorious, nor was it adverse and non permissive for the statutory period as to the area directly north of her old chain-link fence. Therefore, Ms. Lannin has not established title by adverse possession to any land north of the green line shown on the Anderson Survey. 





 C. Sweeney's front yard and driveway 





 Mr. Sweeney has title to the area east and north of Lot 12A, within the green lines as shown on the Anderson Survey. For that area to the northeast of the northern boundary of Lot 12A, within the green lines of the Anderson Survey, Mr. Sweeney, and Mr. Bezanson before him, have gained title by adverse possession. By the Derelict Fee Statute, G.L. c. 183, § 58, Mr. Sweeney owns the area between the eastern bound of Lot 12A and the centerline of Woodbine Avenue, shown as Lake Avenue on the Pratt Plan, because his Deed description locates Lot 12A as "by Lake Avenue." Exh. 2B, Exh. 7, Exh. 24; Casella v. Sneirson, 325 Mass. 85 , 89 (1949). Further, Mr. Sweeney's and Mr. Bezanson's use of Woodbine Avenue has extinguished any easement to pass over that area of Woodbine Avenue. 





 The standard for adverse possession is discussed above. An easement may be extinguished by "[a]cts of a servient tenant, incompatible with the existence of an easement," or a use which would be privileged if, and only if, the easement did not exist, adverse to the owner of the dominant estate and continuing for the twenty-year period of prescription. Desotell v. Szczygiel, 338 Mass. 153 , 159 (1958); Lemieux v. Rex Leather Finishing Corp., 7 Mass. App. Ct. 417 , 421-422 (1979); see New England Home for Deaf Mutes v. Leader Filling Stations Corp., 276 Mass. 153 , 159 (1931). A use that is not inconsistent with the use of the easement is not adverse and will not extinguish an easement. Patterson v. Simonds, 324 Mass. 344 , 352 (1949); New England Home for Deaf Mutes, 276 Mass. at 158. The extinguishment only extends to that part of the easement that was interfered with; that is, an easement may be partially extinguished. Post v. McHugh, 76 Mass. App. Ct. 200 , 205 (2010); Lemieux, 7 Mass. App. Ct. at 423-424, and cases cited. The servient estate has the burden of proving extinguishment. Id. at 422. 





 The areas constituting Mr. Sweeney's driveway and front yard have been used adversely, openly, notoriously, exclusively, and continuously for over twenty years. Further, the acts of enclosing the yard and paving the driveway were sufficient to extinguish any easements over the layout of Woodbine Avenue, a private way, that is within his driveway and front yard. As the elements of adverse possession and extinguishment overlap, they are both addressed below. 





 a. Continuous Use 





 By enclosing the front yard of the Sweeney Property with a chain-link fence, Mr. Bezanson and Mr. Sweeney continuously used the area of the yard within the Woodbine Avenue layout for a period of more than twenty years. Mr. Bezanson installed the fence along Woodbine Avenue, running north from the chain-link fence between his yard and the Lannin Property, in 1985. Tr. II-107-109. Together with the old chain-link fence that ran along the southern end of the front yard, this had the effect of enclosing the front yard of the Sweeney Property on two sides. The fence was still in place when Mr. Sweeney purchased the property in 2004. Tr. II-109. Mr. Sweeney then replaced the fence sometime in 2004, installing a new fence along the southern side up against the old chain-link fence, replacing the fence along the street, and adding a section by the southeastern corner of his house and along his driveway in order to fully enclose the yard to keep his dogs secure. Tr. I-165-166, I-167-168. The same fence is still in place today. View. Keeping a physical object on the ground is use, and enclosing an area is undoubtedly use. See LaChance v. First Nat'l Bank & Trust Co., 301 Mass. 488 , 491 (1938) ("The filling of the land and the erection of the wall were permanent improvements indicative of an intention upon the part of the occupants to use and appropriate the land to their own benefit and to the exclusion of all others."). Therefore, by enclosing the front yard since 1985, I find that Mr. Sweeney and Mr. Bezanson continuously used that area from 1985 until well past 2005, longer than twenty years. 





 As for the driveway, I find that the driveway area was also continuously used for over twenty years. When Mr. Bezanson owned the Sweeney Property, the driveway was unpaved, and was raised above the street when the septic system was installed around 1985. Tr. II-113-114. Mr. Bezanson testified that his tenants used that area of the property while he was the owner. Tr. II-71. Mr. Sweeney had the driveway paved around 2005, in the same spot where the driveway had existed when he purchased the property. Tr. II-14-15. Mr. Sweeney uses the driveway to park his truck. Tr. I-163. I find that starting at least in 1985 until well after 2005, twenty years later, the driveway on the Sweeney Property, occupying that area northeast of the northeastern corner of Lot 12A of the Pratt Plan, was used continuously. Exh. 2B. 





 b. Open and Notorious Use 





 The act of enclosing the front yard of the Sweeney Property within the Woodbine Avenue layout, first by Mr. Bezanson and then by Mr. Sweeney, was sufficiently "open and notorious" as to place any true owner on notice. Building a fence around land is undoubtedly an act of notoriety. Poignard, 23 Mass. at 178. Therefore, I find that by erecting a fence that enclosed the yard area beginning in 1985, Mr. Bezanson and Mr. Sweeney engaged in open and notorious use of the front yard for over twenty years. 





 Mr. Bezanson, his tenants, and Mr. Sweeney also openly and notoriously used the driveway area for over twenty years. First, when the septic system was installed in 1985, the driveway, along with the rest of the front yard, was raised above street level. Tr. II-113-114; View. While the driveway was originally unpaved, raising it above the street was not only without concealment but "sufficiently pronounced so as to be made known...to the landowner." Boothroyd, 68 Mass. App. Ct. at 44. When Mr. Sweeney paved the driveway in 2005, that use was even more open and notorious. Thus, for a period of over twenty years, the use of the area constituting the driveway on the Sweeney Property extending beyond Lot 12A was open and notorious. Exh. 2B. 





 c. Exclusivity 





 Mr. Sweeney and Mr. Bezanson's use of the front yard within the Woodbine Avenue layout was also exclusive for the statutory period. From when the front corner of the front yard was enclosed in 1985, the fence excluded "all third persons" in a manner an owner would have. Peck, 34 Mass. App. Ct. at 557. Erecting the fence was undoubtedly an act of enclosure, sufficient to evidence exclusive possession. LaBounty, 352 Mass. at 349. There was no evidence before me that, after Mr. Bezanson fenced the front yard off from the street in 1985, there was any concurrent use of the front yard area beyond the bounds of Lot 12A. Then, once Mr. Sweeney completely enclosed the front yard in 2004, in order to keep his dogs within the fence, it necessarily kept all third persons out. Tr. I-165-168. That fence remained in place up until the time of trial. View. Therefore, I find that the use by Mr. Sweeney and Mr. Bezanson (and his tenants) was exclusive for the statutory period. 





 The use by Mr. Sweeney and Mr. Bezanson of the driveway was also exclusive. There was no evidence before me that anyone other than Mr. Sweeney, Mr. Bezanson, or Mr. Bezanson's tenants had ever used that area which is used as a driveway. While the driveway was not completely enclosed, by raising it up above street level in 1985, and maintaining it between two fences that run out to the street (one to the North, and the one along Woodbine Avenue to the south), I find that the orientation of the driveway excluded a "similar use or possession by others" for more than twenty years. 





 d. Adverse/Non-permissive Use 





 Mr. Sweeney and Mr. Bezanson's use of the front yard within the Woodbine Avenue layout was adverse, or non-permissive. There is no evidence before me that the "true owner" gave permission to use that area fenced in in front of Mr. Sweeney's house. Ms. Lannin, as I found, is not the "true owner," so she could not have given permission to use the front yard. Mr. Sweeney and Mr. Bezanson's use, fencing in the yard and maintaining it, demonstrates that they did not "recognize or consider [themselves] to be subject to an authority... to prevent [their] use of the property." Bills, 4 Mass. App. Ct. at 284. Mr. Bezanson installed a septic system in that front yard; Mr. Sweeney planted arborvitae and maintained the lawn, and let his dogs have the run of the yard. Therefore, I find that, since 1985, up until the time of trial, a period of more than twenty years, the front yard was used adversely and non-permissively by Mr. Bezanson, his tenants, and Mr. Sweeney. 





 Finally, the driveway was also used in an adverse, non-permissive manner for over twenty years. Mr. Bezanson had the driveway raised when the septic system was installed, indicating he did not consider himself to be limited in his use of the driveway. Mr. Sweeney had it paved. The evidence before me of their use is uncontroverted, there is no evidence of permissive use, and I find that the use of the driveway was adverse and non-permissive for over twenty years, beginning at least in 1985 when Mr. Bezanson installed the septic system. 





 I find, based on the evidence, that Mr. Sweeney, and his predecessor, Mr. Bezanson, occupied and used the area beyond Lot 12A to the east and north but within the green lines shown on the Anderson Survey adversely, openly, notoriously, exclusively, and continuously between 1985 and the time of trial, a period of more than twenty years. Twenty years from 1985 is 2005. Thus, Mr. Sweeney has established title by adverse possession to this area, title that ripened in 2005. 





 e. Inconsistent with the easement 





 The fence, installed in 1985, made the use of the front yard within the Woodbine Avenue layout by Mr. Bezanson and Mr. Sweeney incompatible with the use of the easement as a private way. Desotell, 338 Mass. at 159. Once the fence was installed, no one could use that portion of Woodbine Avenue to pass and repass. Mr. Sweeney replaced the fence in 2004, and has maintained it since then. The driveway, while not completely fenced off, was also used in a manner inconsistent with use as a private way, due to its orientation between a wooden fence to the north, and the fenced-in yard to its south. Exh. 2B, View. Especially after it was raised above the road level in 1985, it was delineated from the road. No one would enter it except to park, and it could not be used as a part of the private way. Therefore, both the front yard and the driveway, to the extent they overlap with the layout of Woodbine Avenue, have extinguished any easement rights held by third parties to pass and repass over the road, as of 2005, twenty years after Mr. Bezanson installed the septic system, fencing, and raised the driveway. 





 III. Encroachment 





 Ms. Lannin's Complaint has a single claim for encroachment. An individual "who intentionally enters land in the possession of another is subject to liability to the possessor for a trespass, although his presence on the land causes no harm to the land, its possessor, or to any thing or person in whose security the possessor has a legally protected interest." Restatement (Second) of Torts § 163 (1965). A plaintiff who proves that the defendant committed an intentional, unprivileged trespass to his real property is entitled to recover nominal damages, even if no actual damage is shown. Lawrence v. O'Neill, 317 Mass. 393 , 395 (1944); Metropoulos v. Macpherson, 241 Mass. 491 , 503 (1922). 





 To prevail in an action for trespass, the plaintiff must show that he or she had actual possession of the real property or a right to possession of the property at the time of the trespass. Federal Nat'l Mtge. Ass'n v. Gordon, 91 Mass. App. Ct. 527 , 535-538 (2017); Attorney Gen. v. Dime Sav. Bank of N. Y., FSB, 413 Mass. 284 , 288 (1992). One is in possession of land if he or she (1) is in occupancy with intent to control the property, (2) was formerly in occupancy with intent to control if no other person has obtained possession, or (3) has the right to immediate occupancy if no other person is in possession. Restatement (Second) of Torts § 157 (1965). 





 Having found that Mr. Sweeney holds title to the area within the green lines shown on the Anderson Survey, by record title and by adverse possession, which extends to the chain link fence between the Lannin and Sweeney Properties, Ms. Lannin's claim of encroachment fails, because she does not own the property that is claimed to be trespassed/encroached upon. Therefore, Ms. Lannin's claim of encroachment must be dismissed. 





 IV. Sweeney's Counterclaims 





 Mr. Sweeney's Answer to Ms. Lannin's Complaint contained two counterclaims: (I) Misrepresentation of Material Facts, and (II) Filing of a Complaint as retaliation and in bad faith. Because these claims were not tried before me, nor briefed after trial, they will both be dismissed for lack of prosecution. 





Conclusion 





 Based on the foregoing, I find and declare that the Sweeney Property is located and bounded according to the green lines on the Anderson Survey, and is adopted by this Court for purposes of registration. The objections to registration advanced by Ms. Lannin are dismissed. Mr. Sweeney is obligated to demonstrate an unbroken chain of title beginning with the owner of the property shown on the Pratt Plan. Once he has done this, he will have proven title to his property and the title to the parcel shown on petitioner Sweeney's file and accompanying survey by Anderson Surveys, Inc., may be registered and confirmed subject to other matters as are disclosed by the examiner's abstract which are not in issue herein. Judgment shall enter in case no. 19 MISC 000123 as follows. A declaration shall enter that Ms. Lannin holds title to that area within the orange lines on the Anderson Survey south of the green lines, that lies just north of her house, by adverse possession, but otherwise does not hold title to any area within the green lines of the Anderson Survey. The remainder of Count I of the Complaint, and the entirety of Counts I & II of the Counterclaim, shall be DISMISSED with prejudice. 





 Judgment Accordingly. 





EXHIBIT A











EXHIBIT B











EXHIBIT C























FOOTNOTES
[Note 1] A view "inevitably has the effect of evidence, and information properly acquired upon a view may properly be treated as evidence in the case." Talmo v. Zoning Bd. of Appeals of Framingham, 93 Mass. App. Ct. 626 , 629 n.5 (2018) (internal citations and quotations omitted); see also Martha's Vineyard Land Bank Comm'n v. Taylor, No. 17-P-1277 (Mass. App. Ct. June 22, 2018) (Rule 1:28 decision). 

[Note 2] Exhibit 34 is the oldest deed in Mr. Sweeney's chain of title that is in evidence, recorded April 6, 1937 at Book 1721, Page 552 (Staples to Lajunen, Hill, and Kuja). Exhibit H to Ms. Lannin's Complaint also contains an older deed in his chain of title, recorded September 1, 1934 at Book 1675, Page 291 (Rockland Cooperative Bank to Staples). Mr. Sweeney has not presented a full chain of title to the court, nor did his title examiner produce a chain of title extending any further back than 1964. Exh. 3. 



 Notwithstanding the failure of the petitioner to provide a full chain of title, a quick review of the registry shows Mr. Sweeney's chain of title running back from Exhibit 34 as follows: 





- Deed from Rockland Cooperative Bank to Lendall Staples, recorded in Book 1675, Page 291, as authorized by a Vote of the Board of Directors of Rockland Cooperative Bank to execute the deed of John H. Hagerty Property, "being lot 12A" on the Pratt Plan, recorded in Book 1671, Page 557. 





- Deed from Jessie B. Dawes to John H. Hagerty, granting lots 12A and 13A on the Pratt Plan, recorded in Book 1514, Page 58.





- Deed from Bernice L. Shepard to Jessie Dawes, granting lots 12A and 13A on the Pratt Plan, recorded in Book 1384, Page 128. 





- Deed from James T. Kirby, Administrator of the Estate of John Chandler, to Bernice L. Shepard, granting a large plot of land including lots 12A and 13A, recorded in Book 1226, Page 579. 





 For the purposes of this decision, it will be presumed, for the time being, that Mr. Sweeney holds Lot 12A by an unbroken chain of title. Mr. Sweeney will be obligated to confirm his chain of title before any registration decree can be entered.



[Note 3] As discussed in note 2, supra, that while the court presumes that Mr. Sweeney holds Lot 12A by an unbroken chain of title, he will be obligated to confirm his chain of title before any registration decree can be entered. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.